**R. J. CLEARY and Allene C. Cleary, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 62–004.**

United States District Court
W. D. Pennsylvania.

Aug. 26, 1964.

Zeno Fritz, Pittsburgh, Pa., for plaintiffs.

David G. Hill, Asst. U. S. Atty., Gustave Diamond, U. S. Atty., and Edward J. Snyder, Atty., Dept. of Justice, Washington, D. C., for United States.

DUMBAULD, District Judge.

This is a suit to recover income tax collected for the year 1952. The wife-plaintiff is impleaded only as co-signer of a joint return. The husband-plaintiff, R. J. Cleary, a Pittsburgh attorney, conducted the transactions which the Government claims resulted in taxable income. This Court has jurisdiction under 28 U.S.C. § 1346(a) (1). Jury trial has been waived. This opinion shall be deemed to embody the Court's findings of fact and conclusions of law.

Cleary was acquainted with one Earl Knudsen who in 1947 was financially embarrassed and in need of money. In order to obtain $17,500.00 for Knudsen, it was necessary for Cleary to borrow $23,500.00 from the Allegheny Trust Company of Pittsburgh in order to pay off a balance Cleary owed his broker and to obtain the use of the stocks thus liberated so that they could be pledged as collateral for the note for the larger sum of $23,500.00.

On May 7, 1947, Cleary executed a note in that amount, which recited the

deposit as collateral of 2,000 shares of United Paper Board Company common, 500 shares of M.K.T. common, 800 shares of Rockwell Manufacturing Company common, and $150,000.00 face of Central of Georgia Railway bonds. On the same day Knudsen executed a hypothecation agreement covering 500 shares of M.K.T. and 1,000 shares of United Paper Board. It thus appears that part of the securities pledged belonged to Knudsen.

Of the proceeds of this loan, Cleary on the same day paid his broker (Kay, Richards & Company) $6,128.22, and paid Knudsen the $17,500.00.

On June 2, 1947, Cleary borrowed an additional $6,500.00, pledging 500 shares of United Paper Board, belonging to Knudsen and accompanied by a hypothecation agreement signed by him. On the same day Cleary turned over the proceeds of this loan to Knudsen, together with the proceeds of a dividend check for $1500.00 on Knudsen's Paper Board stock.

Cleary from time to time paid the interest on the loans, being reimbursed by Knudsen for the portion applicable to the proceeds Knudsen had received. (Knudsen in fact continued to pay a uniform amount per month, even after the principal of the loans had been reduced, but Cleary testifies that he accounted for this excess interest in his tax return, and this matter is not an issue in this case.)

In 1948 the loans were consolidated into a single loan of $30,000.00, secured by all the collateral securing the former loans. At the request of the bank, Knudsen furnished Cleary $1,000.00 which was applied in reduction of the principal. On February 7, 1949, at the request of the bank Cleary put up additional collateral belonging to him (100 Central of Georgia Railway voting trust certificates and $1600.00 Central of Georgia Railway bonds). On February 11, 1949, Cleary paid $7,000.00 to the bank on the loan.

Likewise, on February 11, 1949, Cleary authorized sale of 800 shares of Rockwell common stock, and the proceeds of the

sale ($9,564.58) were applied to reduce the principal of the loan.

On October 10, 1951, Cleary paid off the note in full and obtained possession of all the collateral.

In May of 1951 Knudsen sued Cleary in the Court of Common Pleas of Allegheny County at No. 2098 July Term, 1951 In Equity to recover the collateral which Knudsen had delivered to Cleary in 1947 to secure the loan. This action was settled when pursuant to stipulation an order was signed as of October 20,. 1952, by Judge A. Marshall Thompson,. pursuant to which Knudsen was to deliver to Cleary 800 shares of Rockwell stock and pay reimbursement of interest amounting to $550.65 and also the sum of $9,899.35. Knudsen having performed this order on his part, he received back from Cleary the collateral belonging to. him.

It is stipulated that the value of 800 shares of Rockwell stock on October 21, 1952, was $20,800.00, as compared with the $9,564.58, which constituted the proceeds of the sale of Cleary's stock when it was sold in 1949.

The Government's claim for additional tax turns upon this difference in the market value of 800 shares of Rockwell stock. The Internal Revenue agent. auditing Cleary's 1952 return added an item of income amounting to $7,699.35, stating that "taxpayer received during October 1952 in full settlement of the loan—stock having a market value of $20,800.00 and cash in the amount of $9,899.35 total of $30,699.35. Income of $7,699.35 has been realized on the transaction—measured by the difference between the balance of the loan—$23,000.00 and the amount received thereon or $30,-699.35."

Knudsen testified at the trial that he did not know that Cleary's Rockwell. stock was being used as collateral, and that the first time he heard anything about the Rockwell stock was when he tried to get his own collateral back. Cleary's letter of May 7, 1947 (the date of the note) omits to mention the Rock-

well stock when listing the collateral, and indicating what portion of it belonged to Knudsen. However, "Plaintiff's Reply to Amended New Matter" in the Allegheny County suit, verified by Knudsen on February 6, 1952, contains in paragraph 2 an averment "that Defendant informed Plaintiff that if Plaintiff would deliver certain securities to Defendant, Defendant would use said securities and other securities of Defendant as collateral for a loan which would produce sufficient additional cash to permit Defendant to lend money to Plaintiff". Similarly, in paragraph 11 of said pleading Knudsen states "It is admitted that there were discussions between Plaintiff and Defendant as to the advisability of selling said 800 shares of Rockwell Manufacturing Company stock and that subsequently said 800 shares of Rockwell Manufacturing Company stock were sold by Defendant, but it is denied that such sale was motivated by a desire to make application of the proceeds to said loans. On the contrary, it is averred that said sale was against the advice of Plaintiff."

From these admissions in the Allegheny County pleadings, it is clear that, contrary to his present recollection, Knudsen did know that Cleary's Rockwell stock was pledged as collateral for the loan. It is also clear from paragraph 19 of the stipulation between plaintiff and the Government in the present proceedings that the proceeds of the sale of the Rockwell stock were in fact applied to reduce the principal of the loan from the Allegheny Trust Company to $12,435.42.

Consequently, the issue in this case is whether or not the 800 shares of Rockwell stock which plaintiff Cleary received from Knudsen are to be considered as "fungible goods", and the equivalent of the 800 shares of the same stock originally held by Cleary. The Government contends that they represent an entirely new item, the receipt whereof constitutes taxable income. Plaintiff contends, on the contrary, that receipt of this stock simply replaced him in statu quo; that he was lending his credit and collateral to Knudsen, whose duty it was to restore

him to the same position he was in before he undertook to function as a "good Samaritan" for Knudsen's benefit.

Superficially, it would seem plain that, as the Government contends, the new stock is a certificate bearing a different number and date, and is not identical with the original certificate. However, in tax cases we are admonished that substance, not form, is controlling, Comm'r v. Hansen, 360 U.S. 446, 461, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959), and this maxim governs when its application benefits the taxpayer as well as when it benefits the Treasury.

There seem to be no authoritative precedents precisely in point which have been cited to us, although a somewhat similar situation is presented in a Tax Court case relied on by plaintiff, B. F. Goodrich Co. v. Comm'r, 1 T.C. 1098 (1943). There the taxpayer had in 1933 borrowed 11,000,000 francs and repaid in 1936 the same number of francs. It was held that no taxable income was generated by reason of the fact that the value of the franc had meanwhile fluctuated downward, so that the taxpayer required fewer United States dollars in 1936 to liquidate the obligation than would have been required in 1933. The Tax Court pointed out that no real gain or loss results from the borrowing and return of fungible goods.

Borrowing of stock seems akin to borrowing francs or bushels of wheat. Disregarding form, Knudsen was the borrower of Cleary's stock; he benefitted from its use. The fact that it was never handed over to him, that Cleary turned it over directly to the bank, does not change the nature of the transaction. The whole course of dealings required Cleary to be "front man" in making the loan, as Knudsen did not wish to appear in the transaction at all because of the pressure from his own creditors. He did not even dare cash dividend checks on his stock at a bank, but endorsed them to Cleary and received Cleary's check for the same amount in exchange. Hence, looking through form to substance, we

are convinced that Knudsen may be treated as having borrowed the Rockwell stock. When he returned it in kind, there was no gain or loss, any more than would have been the case in a loan of francs or wheat.

It appears that the sale of Cleary's Rockwell stock was necessitated as an outgrowth or incident of his note to the bank, of which he was the accommodation maker for Knudsen's benefit. Although Cleary knew of and consented to the sale of the Rockwell stock which had been pledged as collateral, it seems fair to regard this transaction as an involuntary one, necessitated by market conditions, rather than as an intentional disposition of his stock in the market for purposes of gain or loss as a market speculation. There is no testimony in the record indicating that Cleary sold this stock to make a profit or to establish a loss for tax purposes. The sale came about simply by reason of the fact that the stock was pledged as collateral for the loan and the bank became uneasy and something had to be done.

The Government concedes that if this particular certificate for 800 shares of stock had not been sold and consequently replaced, but had been retained as collateral and subsequently returned to Cleary (as would have been the case if Cleary had satisfied the bank's importunities by furnishing additional new collateral rather than by sacrificing the Rockwell stock), there would have been no gain or taxable income. He would merely have received his 800 shares back, free of the claim of the bank to subject them to use as potential assets for satisfying Cleary's liability to the bank on the note. To treat the new stock as simply being the equivalent of the old, merely replaces Cleary in the position he would have been in if Knudsen had been able to pay off the loan without any necessity of sacrificing any of the collateral.

There is nothing in the record to indicate that Cleary did not intend and wish to continue to hold his Rockwell stock as an investment. Suppose that instead of stock, he had been a coin collector and had pledged 800 Kennedy half dollars as security for the loan. If they had to be sacrificed, and were subsequently replaced by other coins of the same issue, it could hardly be said that taxable income had been produced, merely by reason of fluctuations in the market value of the collateral.

Furthermore, there may be significance in the fact that the stock was received by Cleary pursuant to the terms of a court order. The amount received by a plaintiff pursuant to a jury's verdict in a personal injury case, for example, is not taxable and the same reasoning might indicate that the award received by Cleary pursuant to Judge Thompson's order would also not constitute taxable gain.

Accordingly, we find for the plaintiffs, and in accordance with paragraph 26 of the stipulation the Government is directed to proceed to compute the amount of the judgment hereby entered in favor of plaintiffs.