SERVBEST FOODS, INC., Plaintiff-Appellee, *v.* EMESSEE INDUSTRIES, INC., Defendant-Appellant.

First District (1st Division)  No. 78-1144

Opinion filed March 17, 1980.

Robert J. Peters, Patrick F. Bradley, and Harold S. Horwich, all of Chicago, for appellant.

Michael J. Smith and Martin P. Greene, both of Chicago, for appellee.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

Emessee Industries, Inc. (hereinafter Emessee), brings this appeal from a $76,478.96 judgment in favor of Servbest Foods, Inc. (hereinafter Servbest), by the circuit court of Cook County and from various orders of the trial court ordering production and imposing discovery sanctions upon Emessee. On appeal, Emessee contends that the trial court erred: (1) in granting Servbest contract damages as provided by section 2—706 of the Uniform Commercial Code (hereinafter Code) (Ill. Rev. Stat. 1973, ch. 26, par. 2—706); (2) in granting storage costs and prejudgment interest; and (3) in striking Emessee's affirmative defenses as a sanction for its noncompliance with certain discovery orders. We affirm.

The principal facts in this suit are undisputed. Servbest (as seller) and Emessee (as buyer) entered into a contract on January 23, 1974, for

the sale of 200,000 pounds of 50% lean navel trimmings[1] to be delivered by Servbest to Emessee on February 22, 1974. Under the terms of the contract, delivery of the meat to Emessee would be effected by the transmission of invoices and warehouse receipts. On a practical basis such a transfer required that meat held in cold storage in Servbest's account would be transferred on paper to Emessee's account. The contract further provided that payment of the $105,000 contract price, calculated at a rate of 52½ cents per pound, was due on February 22, 1974, upon delivery of the meat as indicated above.

It is undisputed that on February 22, 1974, Servbest had 200,000 pounds of navel trimmings in cold storage in lot 19700,[2] which conformed to the contract, and that the appropriate invoices and warehouse receipts representing such meat were delivered to Emessee on that date. It is also undisputed that Emessee made no payment of the contract price, or any portion thereof, on February 22, 1974, as required by the terms of the contract. Moreover, attempts by representatives of Servbest to contact Emessee's president, Martin Skolnik (hereinafter Skolnik), subsequent to that date in order to demand payment were futile. Such demand was made, however, to David Lanski, a representative of Emessee. On May 3, 1974, the meat was redelivered to Servbest. A letter acknowledging the redelivery was sent by Emessee to Servbest. In the letter Emessee stated that it considered the Servbest-Emessee contract and Servbest's invoice cancelled.

On July 17, 1974, Servbest filed suit against Emessee, alleging a breach of contract by nonpayment of the contract price. The complaint further alleged a mitigating resale of 200,000 pounds of navel trimmings on June 12, 1974, to a bona fide purchaser at 20¼ cents per pound. Emessee's answer denied the breach and alleged two alternative affirmative defenses: (1) that Servbest cancelled the contract, relieving Emessee of any further obligations thereunder, including payment (Ill. Rev. Stat. 1973, ch. 26, par. 2—703); and (2) that Servbest accepted a contract with a Silver Skillet Foods Company (hereinafter Silver Skillet) in accord and satisfaction of Emessee's obligations under the Servbest-Emessee contract.

On January 24, 1975, Servbest made a number of production requests of Emessee pursuant to Supreme Court Rule. (Ill. Rev. Stat. 1973, ch. 110A, par. 214.) When Emessee failed to comply with these requests for approximately one year, Servbest moved to compel production and for attorney's fees and costs (Ill. Rev. Stat. 1973, ch. 110A, par. 219(a)). The court ordered Emessee to produce the requested documents or file an objection to the production requests. Emessee responded by generally

---

[1] Navel trimmings, it was disclosed at oral arguments, are beef trimmings. They are used in a variety of chopped meat products including canned chili.

[2] At this time lot 19700 contained 257,500 pounds of navel trimmings.

objecting to all of Servbest's requests. It should be noted that our review is limited to a request, by Servbest, for the production of all documents reflecting loans "made, secured, received or guaranteed by Emessee during 1974." On August 27, 1976, after hearing full argument on the issues, the trial court ordered Emessee to produce the loan documents by September 15, 1976. The court reserved ruling upon Servbest's motion for costs and attorney's fees.

Subsequently, Emessee moved to vacate the August 27, 1976, order, asserting that the relevancy of the documents had not been established. Emessee filed a memorandum in support of its motion, to which it attached the affidavit of Martin Skolnik, Emessee's president. In the affidavit, Skolnik described his fear that disclosure of the requested loan documents would endanger Emessee's business. On October 5, 1976, the trial court, after a full hearing, denied Emessee's motion to vacate and set a November 1, 1976, compliance date.

In the next few months Emessee apparently made several offers to Servbest for partial compliance.[3] These offers were rejected and on December 6, 1976, when Emessee had still failed to comply, Servbest moved for an order holding Emessee in contempt and for attorney's fees and costs. In the December 20, 1976, hearing on Servbest's motion for contempt, Emessee sought to introduce the testimony of Skolnik as to the damage which could be suffered by Emessee if the loan documents were produced, but was denied leave to do so by the court. However, the trial court did offer to review the loan documents *in camera* and thereafter determine whether they should be turned over to Servbest. Emessee rejected this offer. The court orally cited Emessee for contempt but reserved ruling on the sanction to be imposed.

In the December 23, 1976, hearing on the issue of sanctions, Emessee was allowed to file an affidavit by Skolnik relating an incident in which Servbest's president, Kentor, made disparaging and derogatory remarks about Skolnik to an official of a bank where Emessee had a business relationship. In the affidavit, Skolnik went on to express the fear that disclosure of Emessee's loan documents would result in Kentor further damaging its reputation in the business community, which would consequently undermine its ability to obtain future financing. The trial court awarded attorney's fees but rejected Servbest's suggestion that a fine or imprisonment might be a feasible sanction in this case. Rather, the court determined that it would impose a sanction against the pleadings. This ruling, the court explained, was the result of Emessee's refusal to

---

[3] While the record is silent on this issue, the briefs indicate that Emessee made offers to Servbest to produce a list of its 1974 loan transactions with verification by an *in camera* inspection of the related documentation or to stipulate that it had the financial capacity to meet its contractual obligations with Servbest in February 1974.

produce the pertinent documents for *in camera* inspection. The court further noted that Emessee could have sought a protective order to avoid impairment of its status and reputation within the business community.

On January 3, 1977, in a last attempt to avoid contempt, Emessee offered to unconditionally produce all of its loan documents reflecting the period from the date of the purchase order to the date of redelivery. As this offer did not reflect full compliance, the trial court refused it on January 5, 1977, and ordered that both of Emessee's affirmative defenses should be stricken. Emessee appeals from the August 27, 1976, October 5, 1976, December 20, 1976, December 23, 1976, and January 5, 1977, orders of the trial court.

Because Emessee's affirmative defenses had been stricken, the sole issue at the trial was Servbest's entitlement to damages. Servbest introduced alternative methods[4] of valuing its contract damages. Servbest sought either the deficiency between the contract price and the amount recovered upon the sale of the meat identified to the contract or the deficiency between the contract price and the amount recovered upon the sale of the first 200,000 pounds of navel trimmings meeting the contract specifications which were sold after the redelivery of the meat by Emessee on May 3, 1974.

Servbest alleged the second alternative as a possible basis for calculating damages because navel trimmings are a fungible good as defined by the Code (Ill. Rev. Stat. 1973, ch. 26, par. 1—201(17)). In further support for this alternative, Kentor testified that it was Servbest's standard practice to ship meat on the basis of its storage-expiration date. Consequently, Kentor concluded, it was only natural that the first 200,000 pounds of navel trimmings sold subsequent to the breach was meat which had the nearest expiration date rather than the meat from lot 19700. Emessee objected to the admissibility of any resale other than those asserted in the complaint or in Servbest's answer to Emessee's interrogatories.

In order to prove incidental damages, Servbest introduced a storage invoice for the storage of 287,550 pounds of meat in lot number 19700. It also claimed prejudgment interest on the total contract price from the date of the breach until the first mitigating resale and then pro rata until the entry of judgment.

Lanski and Kentor testified at trial as to whether Servbest gave Emessee notice of its intent to mitigate its damages after the breach by the resale of the 200,000 pounds of navel trimmings. Kentor and Lanski

[4] On a practical basis these alternatives differed by approximately $13,000 and reflected the decline in the navel trimmings market from January 1974 to June 1974 with a slight recovery by the end of June or the beginning of July. The average price received for the meat under the early sales was $.2125 per pound, while the average price obtained for the meat sold from lot 19700 in July and August was $.2768 per pound.

both testified as to a May 3, 1974, conversation that they had; however, the substance of that conversation was disputed. Lanski's version was that he informed Kentor of the impending redelivery of the navel trimmings and suggested that a requirements contract between Silver Skillet, a corporation in which Lanski was president, and Servbest at the same 52½ cents-per-pound rate allowed Emessee would help remedy Servbest's profit loss from the Servbest-Emessee contract.

Kentor, while acknowledging the Silver Skillet contract, denied that the Silver Skillet contract in any way affected Emessee's obligations to Servbest. Rather, Kentor stated he informed Lanski that Servbest would take whatever recourse was available under the law against Emessee and that he would resell the meat and hold Emessee liable for his losses. Emessee alleged that Kentor was impeached concerning the alleged notice to Emessee by his deposition, which failed to mention any notice given Emessee of Servbest's intent to resell. The trial court, however, ruled that this did not constitute impeachment. At the close of its defense, Emessee requested leave to submit an affirmative defense of lack of notice, but this was denied by the trial court. The trial court did, however, allow Servbest to amend its complaint by deleting the reference as to the date on which the resale was to have occurred in order to comply with the proof adduced at trial.

On March 3, 1978, the trial court, sitting without a jury, entered judgment for Servbest and awarded damages of $64,782.20. This judgment included $1,455.70 in prejudgment interest from February 22, 1974, until June 6, 1974, and $727.00 in storage costs, plus court costs. The trial court specifically found that the meat at issue was fungible and allowed Servbest to calculate damages upon the first sales after the May 3, 1974, breach, which totalled 200,000 pounds of navel trimmings. On March 30, 1978, Servbest filed a timely post-trial motion seeking a modification of the judgment to include prejudgment interests for the period from June 6, 1974, until March 3, 1978. The trial court granted that motion and awarded an additional $11,696.76 in damages to Servbest for a total award of $76,478.96. Emessee filed a timely appeal.

## I. 2—706 Damages

■■ A seller's rights upon the breach of a buyer are outlined in section 2—703 of the Code. (Ill. Rev. Stat. 1973, ch. 26, par. 2—703.) Under this section, a seller may cancel the contract, eliminating any further need of performance by the seller, and additionally may seek damages based upon resale (section 2—706), market price (section 2—708), or contract price (section 2—709) (Ill. Rev. Stat. 1973, ch. 26, pars. 2—706, 2—708, 2—709). The resale remedy afforded by section 2—706, under which Servbest sought and was awarded damages, grants a seller the

right to resell and hold the buyer for the difference between the contract price and the resale price, together with any incidental damages, but less any saved costs. (Ill. Rev. Stat. 1973, ch. 26, par. 2—706(1); *Alco Standard Corp. v. F. & B. Manufacturing Co.* (1970), 132 Ill. App. 2d 24, 265 N.E.2d 507, *aff'd in part, rev'd in part* (1972), 51 Ill. 2d 186, 281 N.E.2d 652.) Section 2—706 provides in pertinent part that:

"(1) Under the conditions stated in Section 2—703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2—710), but less expenses saved in consequence of the buyer's breach.

(2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at [a] public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell." Ill. Rev. Stat. 1973, ch. 26, par. 2—706.

Emessee contends that the trial court erred in utilizing section 2—706 to calculate Servbest's contract damages because the sales accepted by the trial court as resales referred to sales of goods not identified to the contract, while a resale under section 2—706 must be of the goods identified to the contract. Servbest denies the importance of identification to the resale remedy afforded by section 2—706 and in support of its position points out that the Code makes no cross-reference to identification in section 2—706. Whether a resale under section 2—706 is limited to the goods identified to the contract where the goods are deemed fungible appears to be a question of first impression. While language in section 2—706 to the effect that "the seller may resell the goods concerned" would appear to support Emessee's argument, we are required to reject Emessee's narrow reading of this section in light of the policy and intent underpinning the Code and the concept of "resale."

■ It is Emessee's position that the Code provides for fixing the identity of the "goods concerned" which are subject to resale under section 2—706

through the concept of "identification." Identification is that process by which goods are linked, set aside, or otherwise designated as those to which a contract refers. (Ill. Rev. Stat. 1973, ch. 26, par. 2—501; *e.g., Draper v. Minneapolis-Moline, Inc.* (1968), 100 Ill. App. 2d 324, 241 N.E.2d 342.) Identification may occur in any manner and at any time explicitly agreed upon by the parties or in the absence of an explicit agreement by certain methods prescribed by the Code. (Ill. Rev. Stat. 1973, ch. 26, par. 2—501(a) through (c).) The function of identification in the Code is limited. (Ill. Ann. Stat., ch. 26, par. 2—501, at 349 (Smith-Hurd 1963).) Identification replaced passage of title as the condition precedent for attaining an insurable interest in goods which are the subject of a contract. (Ill. Ann Stat., ch. 26, par. 2—501, at 347 (Smith-Hurd 1963).) Identification also plays a role in determining risk of loss. (Ill. Rev. Stat. 1973, ch. 26, par. 2—509.) In each instance identification is related to the interest of a buyer in the goods and consequently his right to insure them and to bear the risk of loss if they are damaged.

In determining whether identification is similarly linked with the right to resell under section 2—706, it is necessary first to explore the purpose of the resell remedy. It is a basic premise of any theory of contract damages that an aggrieved party should be placed in the position that he would have occupied but for the default. (11 S. Williston, Williston on Contracts §1338 (3d ed. 1968); 22 Am. Jur. 2d *Damages* §47 (1965).) Section 2—706 also seeks to award damages based upon the protection of the seller's expectation interest. (Ill. Rev. Stat. 1973, ch. 26, par. 1—106; see generally R. Nordstrom, Handbook of the Law of Sales §173, at 521 (1970); J. White and R. Summers, Uniform Commercial Code §7—6 (1972).) Although the only Illinois case law on this code provision, *Alco Standard Corp. v. F. & B. Manufacturing Co.* (1972), 51 Ill. 2d 186, 281 N.E.2d 652, offers little analysis of the intent or scope of this provision, the official comments to the Code are instructive:[5]

> "Under this Article the seller resells by authority of law, in his own behalf, for his own benefit and for the purpose of fixing his damages. * * *.
>
>          * * *
>
> 4. Subsection (2) frees the remedy of resale from legalistic restrictions and enables the seller to resell in accordance with reasonable commercial practices so as to realize as high a price as possible in the circumstances." (Ill. Ann. Stat., ch. 26, par. 2—706, Uniform Commercial Code Comment, at 529-30. (Smith-Hurd (1963).)

---

[5] For a discussion of the role of Code comments in interpreting the meaning of Code provisions see White & Summers, Uniform Commercial Code 4, 12 (1972).

Further insight is offered by Anderson in his text on the Uniform Commercial Code, where he explains that:

"* * * the object of the resale is simply to determine exactly the seller's damages * * *. The object of the resale in such a case is to determine what the market price in fact was. Unless the resale is made at about the time when performance was due it will be of slight probative value, especially if the goods are of a kind which fluctuate rapidly in value, to show what the market price actually was at the only time which is legally important." R. Anderson, Uniform Commercial Code §2—706:19, at 385 (2d ed. 1971).

From the foregoing references, it would initially appear necessary to restrict resales to goods identified to the contract in order to insure that the price received for the goods upon the resale accurately reflects the market value of the goods which are the subject of the contract, consequently guaranteeing the seller his expectation value. However, the Code embodies a retreat from the mechanical technicalities of prior commercial codes and dictates a liberal construction in order to provide a practical working tool for the commercial community. (Ill. Rev. Stat. 1973, ch. 26, par. 1—102.) For an analysis of the purpose of the Uniform Commercial Code by one of its drafters, see Llewellyn, *Why a Commercial Code?* 22 Tenn. L. Rev. 779 (1953). Therefore, it is important to examine the necessity of identification in the context of fungible goods. It should be noted at this juncture that Emessee does not attack the characterization of the meat in this case as fungible, but rather asserts that it is not fungibility which is at issue, but rather whether a resale must be of those goods identified to the contract.

■ Fungible goods, as defined by the Code, are goods of which "any unit is, by nature or usage of trade, the equivalent of any other like unit." (Ill. Rev. Stat. 1973, ch. 26, par. 1—201(17).) Fungible goods, unlike other goods, are sold not by a description but in quantities by weight, measure, or count; the constituent parts making up the mass being indistinguishable from each other by any physical characteristic. (*Maritime Petroleum Corp. v. Jersey City* (1949), 1 N.J. 287, 63 A.2d 262; see generally L. Vold, Law of Sales (2d ed. 1959); J. Raphael, The Uniform Commercial Code Simplified, at 5 (1967); 67 Am. Jur. 2d *Sales* §125.) Generally, goods which are stored in bulk such as grains (*United States v. Luther* (10th Cir. 1955), 225 F.2d 499), coal screenings (*White Walnut Coal Co. v. Crescent Coal & Mining Co.* (1912), 254 Ill. 368, 98 N.E. 669), and liquids (*Maritime Petroleum Corp. v. Jersey City*), have been held to be fungible by nature but goods stored in packages, parcels, or units not strictly interchangeable such as cans of fruit (*Pacific Grape Products Co. v. Commissioner of Internal Revenue* (9th Cir. 1955), 219 F.2d 862), cases

of dog food (*California Animal Products Co. v. Lappin* (1934), 54 R.I. 75, 170 A. 71), and sugar in 100 pound bags (*United States v. Amalgamated Sugar Co.* (10th Cir. 1934), 72 F.2d 755), have also been held fungible by usage of trade or agreement. Stock is also generally recognized to be a fungible good. *Richert v. Bennett* (1936), 283 Ill. App. 479; *Cleary v. United States* (W.D. Pa. 1964), 232 F. Supp. 828; *In re Ellis' Estate* (1939), 24 Del. ch. 393, 6 A.2d 602.

■ In the instant case Emessee has introduced no evidence to suggest that the goods which were the subject of the resales were not identical in quantity, quality and description from those contained in lot 19700 which were identified to the contract. Nor does Emessee allege that any particular boxes of navel trimmings in lot 19700, which contained 287,500 pounds of navel trimmings, were specifically identified to the contract. Under Emessee's approach, a sale of any 200,000 pounds of meat from lot 19700 would constitute a proper resale while identical meat from a different lot would be insufficient for that purpose. We do not agree. From our analysis of the record we find no basis upon which to conclude that the market value of the navel trimmings sold from outside of lot 19700 was any different from the market value of the meat contained in lot 19700. Moreover, the nature of fungible goods suggests no reason why, where a contract involving fungible goods is breached by the buyer, a seller could not recover a deficiency award under section 2—706 based upon a resale of goods other than those identified to the contract inasmuch as such a sale would not affect or alter the price received for the goods in either a private or public sale. Accordingly, we hold that the trial court's decision to employ the first sales of navel trimmings after the breach totalling 200,000 as a mitigating resale under section 2—706 was not erroneous.

We should note that such a finding is consistent with the statement in section 2—706 that a resale may concern goods which were not in existence or identified to the contract prior to the breach. While this provision has been said to refer to an anticipatory breach (Ill. Ann. Stat., ch. 26, par. 2—706, Uniform Commercial Code Comment, at 530-31 (Smith-Hurd 1963)), it suggests that identification is not crucial to recovery under section 2—706. If identification is not essential in all resales then section 2—706 should not preclude the resale of a fungible good not identified to the contract. Furthermore, the Code comments suggest that goods identified after the breach will fix the seller's damages quite as satisfactorily as if they had been identified prior to the breach as long as the goods "conform to the contract." This requirement appears to be met where fungible goods are sold. Ill. Ann. Stat. 1973, ch. 26, par. 2—706, Uniform Commercial Code Comment, at 531 (Smith-Hurd 1963).

Emessee next argues that, even if the resale of fungible goods might

be permissible under section 2—706, the trial court erred in allowing Servbest to amend its complaint and to introduce evidence of resales at trial which were mentioned neither in its complaint nor in its answers to interrogatories. Servbest's original complaint sought damages based on a June 12, 1974, resale while the permitted amendment, filed at the close of the trial, provided that Servbest "resold the aforementioned 200,000 pounds of navel trimmings to *bona fide* purchasers in a commercially reasonably(e) [*sic*] manner." Emessee claims that proof of sales other than that of June 12, 1974, prejudiced it, and therefore asks us to reverse the trial court's action.

■■ Initially, we should comment that we find no error in the trial court having allowed Servbest to introduce evidence as to alternative resales. As has already been noted, section 2—706 has received scant interpretation in Illinois, and while other jurisdictions have litigated this provision, there is as yet very little direction to the business community as to what might constitute a valid resale under this provision. The trial court, cognizant of the uncertainty of the law in this area, declined to restrict Servbest to its pleadings. We think this approach was consistent with the intent of the Code.

■■ Moreover, it is well settled that trial courts have broad discretion in the matter of permitting amendments to pleadings, and a ruling allowing an amendment will be sustained absent a showing of manifest abuse of discretion which materially prejudices the complaining party. (Ill. Rev. Stat. 1973, ch. 110, par. 46(1); *Austin Liquor Mart, Inc. v. Department of Revenue* (1972), 51 Ill. 2d 1, 280 N.E.2d 437; *United Air Lines, Inc. v. Conductron Corp.* (1979), 69 Ill. App. 3d 847, 387 N.E.2d 1272.) The decision to allow Servbest to amend its complaint prior to the judgment to comply with the proof received at trial was within the discretion of the trial court. The defendant, Emessee, had received prior to trial as a part of discovery copies of all of Servbest's 1974 navel trimmings sales invoices. Accordingly, we find no prejudice to Emessee from the amendment of Servbest's complaint.

Emessee further argues that section 2—706 damages are not available because Servbest has failed to meet certain requirements of that provision which required: (1) that the resales should be reasonably identified to the broken contract; (2) that they should be commercially reasonable; and (3) that notice should have been given to Emessee of Servbest's intent to utilize the resale remedy in mitigation of its damages. Emessee first claims that the present resale was not reasonably identified as referring to the broken contract. This type of identification, as opposed to the identification defined by section 2—501 and referred to earlier, Emessee suggests, requires the seller to make a contemporaneous identification of the contract of resale to the allegedly broken contract. Servbest failed to

comply with this requirement, Emessee contends, as illustrated by the fact that it presented four different groups of sales during the course of these proceedings as constituting the mitigating resale of the navel trimmings. Emessee urges that such an approach, if sanctioned by the court, would allow a seller to make several sales after a breach and then pick one of them as complying with section 2—706. We do not agree. Identification of the resale to the broken contract merely requires that the resale consist of goods in conformity to the specifications of the contract. Where the goods identified to the contract are the subject of the resale, it is obvious that the resale is identified to the contract if those goods were conforming. Therefore, only in the case of an anticipatory breach or upon the resale of a fungible good can this issue be raised. In the latter case, if the goods are truly fungible and the goods originally identified to the contract were conforming, then identification of the resale to the contract is established.

In the present case Emessee has not presented any evidence that the resales did not conform to the specifications involved in the Servbest-Emessee contract. Moreover, its concern that a seller will manipulate a resale in order to obtain a particularly high price affects the question, not whether the resale is identified to the contract, but rather, whether the sale was commercially reasonable.

We next turn to Emessee's argument that the Servbest resales failed to meet the test of commercial reasonableness set forth in section 2—706. Under Section 2—706 every aspect of the sale must be commercially reasonable: the method, manner, time, place, and terms of the sale. (Ill. Rev. Stat. 1973, ch. 26, par. 2—706(1)(2); *McMillan v. Meuser Material & Equipment Co.* (1976), 260 Ark. 422, 541 S.W.2d 911; *Bache & Co. v. International Controls Corp.* (S.D.N.Y. 1972), 339 F. Supp. 341; *Meadowbrook National Bank v. Markos* (N.Y. Sup. Ct. 1967), 3 UCC Rep. 854.) This "good faith and commercial reasonableness" requirement is a more comprehensive standard than the "reasonable care and judgment" standard established by the Uniform Sales Act (Ill. Rev. Stat. 1959, ch. 121½, par. 60(5)), according to the official comments to the Code (Ill. Ann. Stat. 1973, ch. 26, par. 2—706, Uniform Commercial Code Comment, at 529 (Smith-Hurd 1963)). This standard of honesty and fair dealing is the foundation upon which the Code was drafted. (Ill. Rev. Stat. 1973, ch. 26, pars. 1—102(3), 1—203; R. Anderson, Anderson's Uniform Commercial Code §1—203:1 (1961).) While it is a vague concept subject to a wide variety of interpretations from case to case, its flexibility is a feature which is needed by any Code to make it work in practice. (Anderson, Anderson's Uniform Commercial Code §1—203:2 (1961).) What is fair and "commercially reasonable" will consequently vary with the product, the industry, and the time when the controversy occurs. R. Nordstrom, Handbook of the Law of Sales §173, at 523 (1970).

The record in the instant case provides no suggestion of impropriety in the present resale. Kentor, the president of Servbest, testified that the group of sales selected by the trial court to calculate damages pertained to 200,000 pounds of 50% lean navel trimmings and occurred between May 16, 1974, and June 6, 1974. It is not asserted that these were not the first sales of navel trimmings subsequent to the redelivery of the meat from Emessee on May 3, 1974. Rather, there is evidence that these sales were made first, rather than selling the meat from lot 19700 first due to the expiration dates on the meat's storage contracts. Therefore, we find that no issue is raised as to Servbest's picking and choosing sales in order to increase the amount due by Emessee. Moreover, the record reveals that the resales were made to various customers at a variety of prices, thereby implying that the resales were arms-length transactions as opposed to sales between related business entities or contrived sales where the seller would buy back the goods within a short time.

Nor do we think that Emessee may contend that Servbest's resales were commercially unreasonable because the average price on resale was 30 cents per pound lower than the contract price. It is generally recognized that the fluctuating nature of markets requires a seller to resell as soon as possible after the breach. (*McMillan v. Meuser Material & Equipment Co.* (1976), 260 Ark. 422, 541 S.W.2d 911; *Bache & Co. v. International Controls Corp.* (1972), 339 F. Supp. 341.) The instant resales were made within a month of Emessee's redelivery of the meat. In view of the huge quantity involved, that length of time, in and of itself, does not suggest commercial unreasonableness. Nor has any evidence been presented that Servbest knew or should have known that the declining navel trimmings market would improve if it merely waited. What is clear from the record, however, is that had Emessee redelivered the meat to Servbest shortly after February 22, 1974, instead of waiting over two months to return it, the price recovered on the resale would have been higher.

Emessee focuses its allegation of commercial unreasonableness upon Servbest's alleged misrepresentation of the date of the resale in its complaint. This argument reveals a misperception regarding the term "resale," which is a word of art, a technical term, and may therefore potentially be applied to any of a variety of sales, although only one resale will subsequently be found legally sufficient by the trial court. We find no evidence of misrepresentation from the record; accordingly, the instant resale was commercially reasonable.

■■■ Emessee's final objection to the trial court's award of damages under section 2—706 relates to the notice provision of that section. That section provides for the seller to give the buyer notification of his intent to resell where the seller plans to do so via a private sale. (Ill. Rev. Stat. 1973,

ch. 26, par. 2—706(3).) Emessee argues that as there was no evidence that notice was given, therefore, the trial court should have allowed it to file an affirmative defense of lack of notice at the close of the evidence. We do not agree. Kentor testified that he gave notice of Servbest's intent to resell to Lanski, a representative of Emessee, on May 3, 1974. Emessee alleges that this testimony was impeached by Kentor's deposition which failed to mention the notice to Lanski. Where a party testifies at trial as to material facts not disclosed in a deposition, then a question is raised as to the credibility of the witness which must be resolved by the fact finder. (*People v. Henry* (1970), 47 Ill. 2d 312, 265 N.E.2d 876; *People v. Allen* (1976), 37 Ill. App. 3d 619, 346 N.E.2d 486; *Carroll v. Krause* (1938), 295 Ill. App. 552, 12 N.E.2d 323.) The fact finder's decision as to the credibility of a witness will not be disturbed unless manifestly against the weight of the evidence. (*Bauske v. City of Des Plaines* (1957), 13 Ill. 2d 169, 148 N.E.2d 584.) The trial court determined the issue in favor of Servbest as the trier of fact, and we cannot say that this decision was an abuse of its discretion.

■■ Emessee also argues that Servbest had the obligation to plead and prove notice under section 2—706, citing *Anheuser v. Oswald Refractories Co.* (Mo. App. 1976), 541 S.W.2d 706, and *Twin Bridges Truck City, Inc. v. Halling* (Iowa 1973), 205 N.W.2d 736, and that as it failed to so plead it may not recover. The supreme court has held, in *Alco Standard Corp. v. F. & B. Manufacturing Co.* (1972), 51 Ill. 2d 186, 281 N.E.2d 652, that where notice of intent to resell has been given, it is not fatal that the plaintiff has failed to plead notice in his complaint. We find *Alco Standard Corp.* controlling here.

In reaching the conclusion that the group of sales from May 16, 1974, to June 6, 1974, of 200,000 pounds of 50% lean navel trimmings constituted the mitigating resale under 2—706, we find it unnecessary to address Emessee's argument that a resale must occur prior to filing suit. All of the above sales occurred prior to the filing of Servbest's suit on July 17, 1974. Furthermore, based on our findings, it is also unnecessary to determine whether damages could be sustained under any other provision of the Code.

## II. Incidental Damages and Prejudgment Interest

■■ We turn next to Emessee's objections to the trial court's award of incidental damages and prejudgment interest to Servbest. The court awarded $727 for storage costs as well as $13,151.96 in prejudgment interest. It is not contested that incidental damages are available under 2—706 or that storage costs may constitute an incidental damage. (Ill. Rev. Stat. 1973, ch. 26, par. 2—710; *Trilling v. Raffaele* (Pa. 1954), 41 Del. Co. Rep. 44.) Emessee contends, however, that the trial court's

calculation of storage costs was improper in that the storage charges referred to the meat within lot 19700 while the deficiency award was based on the resale of different meat. We do not agree. Recovery of incidental damages should make the seller whole by returning him to the position he would have held were it not for the breach. (Ill. Rev. Stat. 1973, ch. 26, par. 2—710.) It cannot be contested that, due to the redelivery of the meat trimmings to Servbest by Emessee, Servbest had in its possession 200,000 pounds of meat it would not otherwise have had. As a result of this possession, Servbest was responsible for the care and custody of the goods after the breach which included cold storage. Accordingly, it was proper for the trial court to reimburse Servbest for the cost of the storage on the additional 200,000 pounds. Furthermore, upon our review of the record we find that there was evidence to sustain the amount of storage costs awarded.

■■ ■ Nor do we accept Emessee's argument that the amount due Servbest was not subject to exact calculation and, that therefore, prejudgment interest under section 2 of the Interest Act was not available. (Ill. Rev. Stat. 1973, ch. 74, par. 2.) That section provides that creditors shall be allowed to receive interest at five percent for "all moneys after they become due on any * * * instrument of writing * * *." (Ill. Rev. Stat. 1973, ch. 74, par. 2.) It has long been recognized in Illinois that a written contract for the sale of goods is a "written instrument" within the meaning of the statute. (*Alco Standard Corp. v. F. & B. Manufacturing Co.* (1972), 51 Ill. 2d 186, 281 N.E.2d 652; *Smith v. Gray* (1925), 316 Ill. 488, 147 N.E. 459; *Murray v. J. M. Doud & Co.* (1897), 167 Ill. 368, 47 N.E. 717; *Haas v. Cravatta* (1979), 71 Ill. App. 3d 325, 389 N.E.2d 226.) A written contract must, however, include some provisions concerning price so that the amount due under the contract will be fixed or determinable. The amount must also be due in the sense that a debtor-creditor relationship has come into being in order to warrant prejudgment interest. *Haas v. Cravatta; Kansas Quality Construction, Inc. v. Chiasson* (1969), 112 Ill. App. 2d 277, 250 N.E.2d 785; *Builders Windows, Inc. v. Ceco Steel Products Corp.* (N.D. Ill. 1962), 209 F. Supp. 376.

■■ ■ Emessee contends that prejudgment interest is not due under this contract because the need to determine the commercial reasonableness of the resale rendered the damages incapable of exact computation. In general, prejudgment interest will be granted although a good faith defense exists (*Haas v. Cravatta*) and even where the claimed right and the amount due require legal ascertainment. (*Kansas Quality Construction, Inc. v. Chiasson; L. W. Foster Sportswear Co. v. Goldblatt Brothers, Inc.* (7th Cir. 1966), 356 F.2d 906.) Moreover, in *ALCO Standard Corp.* the Illinois Supreme Court specifically found prejudgment interest available where a party sought damages for breach of

contract based upon a resale. In the present case, as in *Alco Standard Corp.*, the amount due under the contract was capable of easy and exact computation, the contract price minus the resale price equalling the amount due on the contract. The plaintiff here sought prejudgment interest at the statutory amount on the entire contract price of $105,000 from the date the meat trimmings were delivered to Emessee, at which time the entire contract price was due, to the date when the plaintiff chose the resale remedy by making the first mitigating sale and thereafter pro rata until the entry of the judgment. We do not find that the trial court erred in awarding interest on this basis as this calculation of interest accurately reflected the amount due on the contract.

### III. Discovery Sanction

We turn finally to Emessee's last argument, which attacks the trial court's action in striking its affirmative defenses for failing to comply with a discovery request of Servbest. A trial court is vested with wide discretionary powers in pretrial discovery matters, including the imposition of sanctions, which will not be modified absent a showing that such discretion has been abused. *People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 226 N.E.2d 6; *White v. Henrotin Hospital Corp.* (1979), 78 Ill. App. 3d 1025, 398 N.E.2d 24; *Williams v. City of Chicago* (1977), 54 Ill. App. 3d 974, 370 N.E.2d 119, *appeal denied* (1978), 71 Ill. 2d 601.

Emessee contends that the trial court abused its discretion in this instance because the documents which were the subject of the trial court's orders were neither material nor relevant to the issues raised in the case, and moreover, if produced could have had a deleterious effect on Emessee's business. The production request by Servbest, which precipitated the trial court's order, sought:

"All notes, pledges, assignments and other records and documents relating to loans made, secured, received or guaranteed by Emessee during 1974."

While the parties agree that the relevancy of these documents was argued before the trial court, the record on appeal does not contain the transcript of any such argument. We must therefore presume on review that the trial court had a sufficient basis for its order. (*Nenadic v. Grant Hospital* (1979), 75 Ill. App. 3d 614, 394 N.E.2d 527; *In re Estate of Reilly* (1979), 68 Ill. App. 3d 906, 386 N.E.2d 462; *G. Brock Stewart, Inc. v. Valenti* (1976), 43 Ill. App. 3d 673, 357 N.E.2d 180; but see *In re Estate of Fado* (1976), 43 Ill. App. 3d 759, 357 N.E.2d 195.) We should note, however, that the record does make reference to at least two possible bases for the relevancy of the documents: (1) the business relationship between

Emessee and Silver Skillet; and (2) the ability of Emessee in 1974 to financially meet the purchase price of the contract.

■■ Moreover, we find no merit in Emessee's argument concerning the potential danger to its business from any disclosure of its 1974 loans. While it was the trial court's duty "to balance the needs of seeking the truth against the needless harassment of a party" (*Cohn v. Board of Education* (1970), 118 Ill. App. 2d 453, 457, 254 N.E.2d 803), we do not think that the trial court abused its discretion in this regard. It appears that a protective order may have avoided any damage to Emessee, which declined such an order although informed by the court that it would consider any protective order requested. Accordingly, we find that the trial court did not err in ordering Emessee to produce the aforementioned loan documents.

We turn then to a determination of whether the trial court correctly ruled that a sanction was warranted in this instance and whether an appropriate sanction was imposed. A sanction may be imposed under Supreme Court Rule 219(c) where noncompliance with a production request or order is unreasonable and the order is just. (Ill. Rev. Stat. 1973, ch. 110A, par. 219(c); *612 North Michigan Avenue Building Corp. v. Factsystem, Inc.* (1975), 34 Ill. App. 3d 922, 340 N.E.2d 678; *Serpe v. Yellow Cab Co.* (1973), 10 Ill. App. 3d 1, 293 N.E.2d 742.) In determining whether noncompliance was unreasonable courts look to whether the conduct of the offending party is characterized by a deliberate and pronounced disregard for the order not complied with (*Serpe v. Yellow Cab Co.*) or whether the actions of the party show a deliberate, contumacious or unwarranted disregard of the court's authority. *Schwartz v. Moats* (1971), 3 Ill. App. 3d 596, 277 N.E.2d 529.

In *612 North Michigan Avenue Building Corp.* this court found noncompliance unreasonable where interrogatories were not answered within 33 days when this conduct was assessed in conjunction with the defendants' failure to deliver certain specific documents requested by plaintiff over a two-year period. This conduct the court found demonstrated a pronounced disregard of the court's orders and authority and consequently acted as an unreasonable noncompliance with discovery.

In the instant case, Emessee refused to supply its 1974 loan documents for over three years. Moreover, it chose a general course of action in regard to Servbest's production requests which was designed to delay the trial and impede Servbest's ability to counter Emessee's affirmative defenses by thwarting any discovery by Servbest. This course of conduct is illustrated by Emessee's objection to the production of any of the documents requested by Servbest for approximately a year and a

half before informing the court that no documents existed to fulfill some of the requests. During this period the trial court expended a great deal of time entertaining motions by Emessee as to the production of the documents and entered several orders to produce.

■■ Moreover, the request for the loan documents, unlike the discovery requests in *In re Estate of Fado* (1976), 43 Ill. App. 759, 357 N.E.2d 195, and *People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 226 N.E.2d 6, was not overly broad or cumbersome. Emessee's procurement of these documents, if not at hand, should have been easily obtained. We might note that while Emessee did make offers of partial compliance to the trial court, such conduct did not render their noncompliance any less unreasonable and an abuse of discretion was not proved by the trial court's failure to accept less than that which it deemed necessary. (*In re Estate of Atwood* (1968), 97 Ill. App. 2d 311, 240 N.E.2d 451.) From the foregoing facts we find that Emessee's conduct did demonstrate sufficient disregard for the court's orders and deliberate disregard of the authority of the court to warrant the trial court's imposition of a sanction for noncompliance.

■■ Nor do we find the trial court's action in striking Emessee's affirmative defenses to be erroneous. Generally a sanction should not serve as a punishment or penalty. (*In re Estate of Fado*; *Savitch v. Allman* (1975), 25 Ill. App. 3d 864, 323 N.E.2d 435.) It is also well established that the entry of a default judgment as a sanction should be employed as a last resort. (*White v. Henrotin Hospital Corp.* (1979), 78 Ill. App. 3d 1025, 398 N.E.2d 24; *Williams v. City of Chicago* (1977), 54 Ill. App. 3d 974, 370 N.E.2d 119, *appeal denied* (1978), 71 Ill. 2d 601.) However, such a sanction is authorized by Rule 219 where a party's disregard of discovery was unreasonable under guidelines set forth by the supreme court in *People ex rel. General Motors Corp. v. Bua*. There, the court, while reversing a default judgment because of the overbroad nature of the production request, stated that where a proper discovery request was not complied with, "* * * a proper sanction * * * would be to strike any defenses of a recalcitrant defendant only on the issues affected by the refusal to comply with discovery orders." 37 Ill. 2d 180, 196.

We think that the trial court acted in compliance with the *Bua* requirement because the information sought did bear a reasonable relationship to the merits of Emessee's affirmative defenses. Moreover, we find that the present case is clearly distinguishable from those cases where the offending party complied with the discovery request, albeit after the imposition of sanctions, and this court reversed similar sanctions on appeal. (*Gray v. Yellow Cab Co.* (1971), 1 Ill. App. 3d 984, 273 N.E.2d 703; *Gillespie v. Norfolk & Western Ry. Co.* (1968), 103 Ill. App. 2d 449, 243 N.E.2d 27.) In the instant case, Emessee's course of action for over

three years more than justified the court's conclusion that its attempt to delay the trial and thwart discovery would have persisted. *612 North Michigan Avenue Building Corp. v. Factsystem, Inc.* (1975), 34 Ill. App. 3d 922, 340 N.E.2d 678.

For the foregoing reasons, the judgment of the circuit court of Cook County, awarding contract damages to the plaintiff, Servbest Foods, Inc., is affirmed.

Affirmed.

McGLOON and O'CONNOR, JJ., concur.