ART PRESS, LTD.,
Plaintiff–Appellee/Cross–Appellant,

v.

WESTERN PRINTING MACHINERY
COMPANY,
Defendant–Appellant/Cross–Appellee.

Nos. 88–1215, 88–1216.

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1988.

Decided July 15, 1988.

Robert E. Kehoe, Jr., Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant-appellant/cross-appellee.

Richard J. Gray, Jenner & Block, Chicago, Ill., for plaintiff-appellee/cross-appellant.

Before BAUER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Here for the second time, this case presents questions under the Uniform Commercial Code arising out of a rotary die cutter that did not work. The jury at the first trial returned a verdict of $95,000. The seller argued on appeal, and we agreed, that the district judge had not allowed the seller adequate leeway in voir dire. 791 F.2d 616 (1986). The second jury, selected by methods more to the seller's liking, returned a verdict of $226,000 in the buyer's favor. The seller has appealed a second time, doubtless thinking that things can't get worse. They can. The buyer has filed a cross-appeal seeking prejudgment interest on the amount of the verdict representing the price of the machine.

Art Press, Ltd., makes paper placemats. It prints them two abreast on a continuous sheet called a web. Some customers want rectangular mats. Art Press makes these by cutting the web as it emerges from the press. A straight cut across the paper by a simple machine called a sheeter produces a stack that can be cut in half by another machine. Art Press ships this finished product. Many customers want place mats with fancy designs—curved or otherwise-formed edges generically called scalloped. To make these, Art Press takes the rectangular product of the cutting machine to a high die cutter, which forces a die through a stack of sheets to produce the finished design. This process of "off-line finishing" —taking the two-placemat sheets to the

cutting machine, then trundling its one-placemat results to the high die cutter and operating that machine—entails a good deal of labor that Art Press wanted to avoid. It also needed a new press and saw the opportunity to make a great leap forward on two fronts by adding on-line finishing to the new press.

While Art Press negotiated with other manufacturers for a color printing press that would run at 1,000 feet a minute (about 50 placemats per second), it opened negotiations with Western Printing Machinery Co. for a rotary die cutter that would operate on-line, cutting and finishing the web emerging from the press. Western makes such machines for printed cardboard and other stiff materials but had never made one for thin paper—neither had anyone else, and after this case it may be a while before anyone tries again.

A rotary die cutter works by forcing the material through rollers spinning in opposite directions. One of the rollers is blank and the other holds a die, formed to the shape of the finished product. As the material passes through the rollers, the die severs the material along the intended lines. The cutter must match the speed of the press exactly, else it will break the web, and must be synchronized too, else it will not cut where the placemats have been printed. Having cut in the right place, the machine must dispose of the trimmed-off material and stack the product for shipment. The jury was entitled to conclude that Western's rotary die cutter did just fine on synchronization but miserably on separating the spoil from the placemats. Art Press was using paper so thin that unless the die completely severed every fiber in the mat, the tug the spoil exerted as it separated at high speed would break the web (or throw it out of alignment) and bring everything to a halt. Western's machine could be used as a sheeter to make a straight cut—provided the press ran at 400 feet per minute or less—but as a die cutter it was worthless. The district judge summed up the evidence: "the machine doesn't run at 800 feet a minute and doesn't run at 400 feet a minute, it just doesn't run." An expert in the trade testi-fied that Western's machine failed because it was defective in conception: *no* rotary die cutter could work with paper the thickness of placemats.

The jury concluded that Western has breached its warranties and awarded Art Press $62,902.50 for the price it had so far paid on the machine, $42,000 for extra expenses incurred to finish the placemats the old way, and $121,065 for extra press charges incurred because of the reduced speed at which the new press had to be run until Art Press could secure a sheeter that would operate at 1,000 feet per minute. (All the awards were stated in Canadian dollars, which the judge later converted to U.S. dollars.) Western has loaded its brief with buckshot, advancing so many arguments that none is developed adequately. We have considered these arguments and believe that the case was properly submitted to the jury, which was entitled to conclude (as it did in response to a special interrogatory) that Western breached a warranty by express description. Given this finding, which Western does not seriously contest, most if not all other claims of error fall away. Western promised to deliver a rotary die cutter that would work on place mats. The typewritten contract says that the machine "will produce ... 'scalloped' (die cut on 4 sides) paper place mats." The device Western delivered did not work at any speed for that purpose, the only one about which Art Press cared. Any errors in the instructions and decisions about evidence were harmless given the overpowering evidence of the machine's utter failure.

■ In particular, it is unnecessary for us to consider Western's strenuous objections to the jury instructions concerning the treatment of its disclaimer of consequential damages. The availability of consequential damages in the face of such disclaimers, when the contractually-limited remedies fail of their "essential purpose", has divided the courts that have discussed § 2–719(2) of the UCC. See Howard Foss, *When To Apply The Doctrine Of Failure Of Essential Purpose To An Exclusion Of Consequential Damages: An Objective*

*Approach,* 25 Duquesne L.Rev. 551 (1987); Jonathan A. Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2–719(2),* 65 Cal.L. Rev. 28 (1977), both of whom collect cases and discuss the problems in interpreting the UCC's language. See also *Chatlos Systems, Inc. v. National Cash Register Corp.,* 635 F.2d 1081, 1086 (3d Cir.1980); *AES Technology Systems, Inc. v. Coherent Radiation Corp.,* 583 F.2d 933, 941 (7th Cir.1978) (Illinois law). Although the disclaimer in this contract does not distinguish among the different warranties, the district judge instructed the jury: "The printed disclaimer cannot exclude any express warranty by description contained in the Proposal and Specification (the typed portion of the contract)." Western's brief on appeal does not challenge this instruction, indeed does not mention it. Whether this instruction be right or wrong, it is the law for today's case in the absence of protest. *Rakovich v. Wade,* 850 F.2d 1180, 1201–1204 (7th Cir.1988) (en banc). The jury found that Western made and did not honor an express warranty by description. Under the instructions, the jury could award consequential damages for breach of this warranty, despite the disclaimer. The court's remaining instructions concerning the disclaimer—those to which Western objected at trial and on appeal—did not influence the award, we can tell in light of the special verdicts the jury returned. Because the instruction concerning the warranty by description, an instruction not open to examination here, was sufficient by itself to produce the verdict, we need not and do not consider whether any of the instructions (including the one about the effect of the warranty by description) was erroneous. We turn, then, to the cross-appeal.

■ Art Press paid Western almost $63,-000 toward the price of the machine but stopped paying when it became clear that it would not produce scalloped placemats. The jury awarded Art Press that entire sum as damages, in response to an interrogatory asking it to set "plaintiff's damages (if any) ... [i]n regard to the money paid the defendant". Art Press asked for pre-judgment interest of some $21,000 on this amount under Illinois law, which the parties agree governs. "Creditors shall be allowed to receive [interest at 5%] ... for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing". Ill.Rev.Stat. ch. 17 ¶ 6402. A contract is an "instrument of writing" for this purpose, and interest becomes due on contractual debts provided "the amount due under the contract will be fixed or determinable, and ... a debtor-creditor relationship has come into being." *Fabe v. Facer Insurance Agency, Inc.,* 773 F.2d 142, 146 (7th Cir.1985) (summarizing Illinois cases); *LaGrange Metal Products, Inc. v. Pettibone Mulliken Corp.,* 106 Ill. App.3d 1046, 62 Ill.Dec. 619, 626, 436 N.E. 2d 645, 652 (1st Dist.1982); *Servbest Foods, Inc. v. Emessee Industries, Inc.,* 82 Ill. App.3d 662, 37 Ill.Dec. 945, 403 N.E.2d 1, 13 (1st Dist.1980) (collecting cases).

The district court denied the request for interest, explaining:

A part of a total jury verdict is not an item which can be calculated from an "instrument of writing." The entire matter was disputed. No part of the claim represented a sum due.

This says: (1) interest may not be recovered when the plaintiff obtains items of damages in addition to those on which interest is appropriate; (2) interest may not be obtained when the defendant disputes liability; and (3) damages under a contract are not "a sum due". Western advances a fourth reason: that it asked the jury to give it what amounted to a *quantum meruit* for the value of the machine, making it impossible to determine a sum due.

Interest compensates people for the time value of money. Western had Art Press's money for years, during which Art Press lost, and Western gained, the ability to earn income on the sum. The jury has determined that Western never should have had the money. Art Press can be made whole for its loss only by interest. Illinois has altered by statute the common law presumption against pre-judgment interest to the extent there are "moneys ... due on ... an instrument of writing"—

which the contract is—and our obligation is to implement that decision.

The district court's first reason for denying interest—that the contractual payments on which Art Press seeks interest were joined at trial with claims for consequential damages on which Illinois does not provide for interest—is not a recognized ground in Illinois (or anywhere else, so far as we know). It cannot be that if Art Press had suffered no consequential damages, and thus recovered only the amount paid on the contract, it would be entitled to interest, but that because its injuries were greater it is entitled to less. Unless some substantive rule of Illinois law is at stake— and we do not believe one is—whether a federal court will try to plumb the meaning of a verdict is a question of federal law. It is a question of the forum's own procedure. Cf. *Budinich v. Becton Dickinson & Co.,* —— U.S. ——, 108 S.Ct. 1717, 1718–19, 100 L.Ed.2d 178 (1988). A federal court might decline to disentangle the sums due on the written instrument from other damages if the verdict were ambiguous, but the jury answered special interrogatories, saying precisely how much Art Press was to receive as a refund due under the contract. We have held that interest may be awarded even on portions of a general verdict, if the court can compute with reasonable confidence the amount on which interest usually accrues. *Williamson v. Handy Button Machine Co.,* 817 F.2d 1290, 1297–99 (7th Cir.1987).

That the "entire matter was disputed" does not change things. Claims often are disputed. If the debtor on a note denies liability—perhaps saying that there was fraud in the inducement—interest is nonetheless available if the jury rejects that defense. Interest may be awarded under a contract "although a good faith defense exists and even where the claimed right and the amount due require legal ascertainment." *LaGrange,* 436 N.E.2d at 652, 62 Ill.Dec. at 626; see also *L.W. Foster Sportswear Co. v. Goldblatt Brothers, Inc.,* 356 F.2d 906, 910 (7th Cir.1966) (Illinois law). The assertion that "no part of the claim represented a sum due" misstates both the record and Illinois law; the amount Art Press paid on the purchase

was money due as soon as Western, having breached its warranty, became required to hand the money back. The failure to return the money, when there is a dispute about the right to retain it, is no different in principle from the failure to pay the purchase price in the first instance when there is a dispute about the obligation to pay (as when, for example, the buyer contends that the goods were defective). Illinois has required defaulting buyers to pay interest on the purchase price when they do not timely settle their accounts—despite a dispute about the obligation that the jury must resolve. The mirror-image case of the seller who does not repay must receive identical treatment.

This also takes care of Western's contention that the sum due was not ascertainable because it had asked the jury to reduce Art Press's recovery on account of the rotary die cutter's limited value as a sheeter (until Art Press obtained a real sheeter for its new press). This line of argument is available in every contractual case, since the goods always are worth *something.* The buyer who keeps the trainload of rutabagas without paying a nickle might try to avoid interest by saying that there were a few defective stalks, creating a dispute about the size of the discount from the contract price and preventing an award of interest. To accept such an argument is to say that interest is not available in contract cases, yet Illinois has gone the other way. See *Servbest,* awarding prejudgment interest on the difference between the contract and "cover" prices for 200,000 pounds of navel trimmings (meat byproducts that are the active ingredient in canned chili). For what it is worth, Western's argument was not properly cast as a contention that it should return less than the contract price; it was instead a contention that because the rotary die cutter had some value as a sheeter, although it was worthless as a die cutter, the consequential damages were not as high as they might have been. Western got full credit, if any was due, in the computation of consequential damages. Illinois courts would not award interest if there were genuine difficulty in computing the purchase price, e.g., *Farwell Construction Co. v. Ticktin,* 84 Ill.App.3d 791, 39

Ill.Dec. 916, 929–30, 405 N.E.2d 1051, 1064–65 (1st Dist.1980) (no pre-judgment interest when the parties disputed the applicability of construction contract charges for changes in specifications), but that is not the problem here once the jury found—as it surely did—that Western's machine had no value at all *as a rotary die cutter*, the function it had been designed to serve. Cf. *North Shore Marine, Inc. v. Engel*, 81 Ill.App.3d 530, 36 Ill.Dec. 588, 401 N.E.2d 269 (2d Dist.1980) (no award of interest when a pleasure boat was used as a pleasure boat for some time before it was sold for the purchaser's account). A large pile of metal has value as scrap; it also could be used as a decoration (we will avoid other comments on modern "sculpture" found in the plazas of federal buildings); neither possibility would stave off pre-judgment interest any more than does Art Press's ability to make the best of things for a time by pressing the machine into service as a sheeter. We therefore reverse the denial of prejudgment interest on the jury's award of $63,000 for Art Press's payments toward the contract price.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.