In the

# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 20-1726 & 20-1727

REXING QUALITY EGGS,

*Plaintiff-*
*Counterclaim Defendant-*
*Appellant,*
*Cross-Appellee,*

*v.*

REMBRANDT ENTERPRISES, INC.,

*Defendant-*
*Counterclaim Plaintiff-*
*Appellee,*
*Cross-Appellant,*

*v.*

JOSEPH L. REXING, *et al.*,

*Counterclaim Defendants-*
*Appellants,*
*Cross-Appellees.*

_____

Appeals from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:17-cv-00141-JMS-MPB — **Jane Magnus-Stinson**, *Judge.*

_____

ARGUED JANUARY 14, 2021 — DECIDED APRIL 22, 2021

———————————

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. On August 16, 2017, Rexing Quality Eggs and owners Joseph and Leo Rexing (collectively "Rexing") filed a declaratory judgment action in Vanderburgh County, Indiana. They sought a ruling that Rexing was excused from its obligations to purchase eggs under a contract that it had with Rembrandt Enterprises, Inc. ("Rembrandt"). Rembrandt removed the action to federal district court,[1] answered the complaint, and filed a counterclaim seeking damages for Rexing's repudiation of the contract. Rembrandt requested damages, attorneys' fees, and interest.

Following discovery, Rembrandt moved for summary judgment on Rexing's claims as well as on its own counterclaim. The district court granted Rembrandt's motion on liability, but concluded that there were genuine issues of triable fact as to the damages Rembrandt had suffered because of Rexing's repudiation.

After a trial on the damages issue, a jury awarded Rembrandt $1,268,481 for losses on eggs it had resold and another $193,752 for losses on eggs that it was not able to resell. Rembrandt then requested that the court award it interest, attorneys' fees, and costs. The district court denied the request; it determined that the interest term in the parties' agreement was usurious, and, as a result, Rembrandt was

———————————

[1] The district court had jurisdiction under 28 U.S.C. § 1332(a).

not entitled to contractual interest or to attorneys' fees. The district court therefore entered final judgment in the amount of $1,522,302.61. Rexing appealed the damages award in favor of Rembrandt, and Rembrandt cross-appealed the denial of contractual interest and attorneys' fees.[2]

We now affirm the district court's judgment on the damages award. The district court properly concluded that the resale remedy under Iowa's version of the Uniform Commercial Code ("UCC"), Iowa Code § 554.2706, was the appropriate mechanism for calculating Rembrandt's damages. Moreover, Rexing waived its arguments challenging the jury's damage award by not presenting them to the district court in a postverdict motion.

As for Rembrandt's counterclaim for interest and attorneys' fees, Rembrandt is correct that the parties' agreement fell within the "Business Credit Exception" to Iowa's usury statute, Iowa Code § 535.5(2)(a)(5). We therefore reverse the district court's denial of Rembrandt's request for interest and fees, and we remand for further proceedings on these matters.

# I

## BACKGROUND

### A.

Joseph and Leo Rexing are brothers who have owned various agribusinesses; among those is Rexing Quality Eggs, which is the unincorporated trade name under which the

---

[2] Our jurisdiction is secure under 28 U.S.C. § 1291.

Rexing brothers have bought and sold eggs for more than twenty years.[3] Before their contract with Rembrandt, the Rexings bought and resold eggs one load at a time, mostly to institutional and warehouse purchasers. They never had entered into a fixed-term contract for the purchase of eggs.

Joseph's son, Dylan Rexing, was Vice President of Operations for Rexing Quality Eggs and had responsibility for negotiating a contract with Rembrandt for the purchase of eggs. The Purchase Agreement dated September 2, 2016 ("Purchase Agreement") provided for the purchase of eggs on a weekly basis and contemplated that Rembrandt would source eggs primarily from farms in Tipton, Missouri, as set forth in Paragraph B:

> Volume: Purchaser shall purchase, and Rembrandt will supply, twelve (12) loads of Shell Eggs per week during the Term … commencing the week of October 3, 2016. For purposes of this Agreement, a "load" is comprised of no less than 25 pallets … with approximately 900 dozen Shell Eggs per pallet. The Parties have agreed to permit Rembrandt a period of time to meet this schedule. Without limitation, the schedule below is a tentative ramp up schedule expected to be in place for deliveries through

---

[3] Although Rexing challenges the district court's summary judgment ruling, it does "not challenge the district court's statement of facts" and employs the district court's facts in its arguments on appeal. Appellants' Br. 4 n.3. We similarly borrow generously from the district court's recitation of facts, *see* R.110, and supplement only as needed.

> the week of December 25 (the "Ramp Up Peri-
> od,") whereby Rembrandt has the right to
> source certain loads from other locations, and
> to supply less than twelve loads per week, un-
> til all loads can be supplied from Tipton, Mis-
> souri location … .[4]

Paragraph B also included a table establishing how many loads of eggs per week could be supplied from non-Tipton locations; the number ranged from one to three. The Purchase Agreement did not anticipate that Rembrandt would supply eggs from non-Tipton sources after February 12, 2017.[5] The parties, however, do not dispute that, prior to Rexing's repudiation, approximately ten percent of the eggs delivered to Rexing came from locations other than Tipton.[6] The price designated in the Purchase Agreement was $0.85 per dozen if supplied from Tipton.[7] If the eggs were supplied from another location, the price was reduced to $0.80.[8]

---

[4] Purchase Agmt. at 1 (emphasis removed). *See* R.1-1 at 8–13 (full text of the Purchase Agreement). We set forth in the text only those sections of the Purchase Agreement most pertinent to the parties' arguments and, for ease of reference, use the internal pagination of the Purchase Agreement.

[5] *See* Purchase Agmt. at 1.

[6] *See* Appellants' Br. 19; Trial Tr. I at 156–57.

[7] *See* Purchase Agmt. at 2 (para. C).

[8] *See id.* The price of eggs shipped from other sites was discounted to cover increased shipping costs. *See* R.78 at 1–2 (Decl. of Riley Pohlman, Rembrandt Inventory Control and Co-manufacturing Mgr.).

Other relevant paragraphs of the Purchase Agreement covered payment and warranty terms; these provided:

E. Payment: Payment terms are Net 21 days from invoice date. Failure of Purchaser to pay any past due invoice shall give Rembrandt the right to suspend future shipments until previous shipments are paid for, and/or, at the option of Rembrandt, to terminate this Agreement by giving written notice thereof to Purchaser. Past due invoices shall be subject to an interest charge of one percent (1%) per month.

…

I. Warranties: Rembrandt represents and warrants to Purchaser that all Shell Eggs sold to Purchaser pursuant to this Agreement will not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, and not be an article which may not be introduced into interstate commerce under the provisions of Section 404 or 405 of such act. NO OTHER REPRESENTATION OR WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, OR OTHERWISE ARE MADE OR INTENDED BY REMBRANDT WITH RESPECT TO THE SHELL EGGS, AND REMBRANDT SPECIFICALLY DISCLAMS ANY WARRANTIES OF

MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE.[9]

Damages for breach of the Purchase Agreement were limited by Paragraph M, which stated: "Other Terms: In no event shall Rembrandt be responsible for any lost profits, or any special, indirect, incidental, consequential, or punitive damages, even if advised in advance of the possibility of such damages."[10] The Purchase Agreement, however, provided for attorneys' fees and costs to the prevailing party "in any dispute arising under this Agreement.[11]

Finally, Exhibit A to the Purchase Agreement set forth the specifications for the type and quality of eggs to be supplied. The Purchase Agreement required that the average weight for each load be between forty-seven and fifty-two pounds, that the load would be inspected for quality and compliance by Rexing, and that Rexing would receive a discount for loads in which less than 91.5% of the eggs failed to conform to specifications.[12]

---

[9] *Id.* at 2–3 (emphasis removed).

[10] *Id.* at 3 (emphasis removed). The Purchase Agreement also provided that it should be governed and construed under Iowa law. *See id.* (para. L).

[11] *Id.* (para. J).

[12] Regarding quality, the Purchase Agreement provided: "With respect to each load of Shell Eggs, ninety-one and a half percent (91.5%) of such Shell Eggs shall grade out as Grade A, and specifically, no more than eight and one half percent (8.5%) of any load of Shell Eggs shall grade

(continued … )

Rexing received its first shipment of eggs at the end of September 2016. After a "Ramp Up Period" agreed to by the parties, Rexing received twelve truckloads of eggs each week. Rexing was displeased with the quality of the initial shipments, and Dylan Rexing sent Rembrandt emails in October 2016, complaining of poor egg quality. Both Rexing and Rembrandt sent representatives to Tipton, the source of most of the eggs. Shell quality and equipment emerged as issues, and the Tipton farms made several changes to equipment and bird nutrition. However, as of November 2016, Rexing still was displeased with the percentage of eggs that were not meeting the quality specifications.

In January 2017, a Mycoplasma gallisepticum ("MG")[13] outbreak hit the Tipton area. Birds at the Tipton farms tested positive for MG, and, in April 2017, Rembrandt began to euthanize its birds at one of the Tipton farms. Between April and June 2017, Rembrandt began supplying eggs to Rexing from farms outside of Tipton with greater frequency. In late May and early June, shipments were underperforming by over twenty percent. Rexing's invoices for these shipments included proper discounts for these underperforming loads.

---

( … continued)

out as restricts or losses." *Id.* at 5. Rexing was entitled to a price credit of up to ten percent for loads that did not meet these requirements. *See id.*

[13] "MG is a bacterium which causes chronic respiratory disease in chickens." R.110 at 12 n.5 (citing *National Poultry Improvement Plan*, U.S. Dep't of Ag. (Apr. 11, 2017), https://www.aphis.usda.gov/aphis/ourfocus/ animalhealth/nvap/NVAP-Reference-Guide/Poultry/ National-Poultry-Improvement-Plan).

When Rexing signed the Purchase Agreement, it had intended to resell the eggs to Hickman's Family Farms, which would in turn resell the eggs to a large retailer. Rexing and Hickman's, however, never entered a formal agreement. After the Purchase Agreement was signed, Hickman's both increased its own production and faced a decreased demand for cage-free eggs. Consequently, it stopped purchasing eggs from Rexing, and, in turn, Rexing notified Rembrandt that it would need to cancel orders due to decreased demand. Rembrandt responded that unless it could find another buyer, it expected Rexing to take the full loads as required by the Purchase Agreement.

After refusing several loads, Dylan Rexing emailed Rembrandt on June 5, 2017, stating that Rexing would not be able to take their full volume of eggs. Two days later, counsel for Rembrandt sent a letter to Rexing demanding assurances that Rexing would accept egg loads in compliance with the terms of the Purchase Agreement. The letter "advised that Rembrandt intend[ed] to resell the shell eggs in the best manner available" and, if it did not receive assurances, would "consider all options, including permanently removing the flock supplying the shell eggs."[14]

On June 9, 2017, counsel for Rexing responded to the demand for assurances. He expressed the opinion that the eggs Rembrandt had been supplying violated an express warranty of quality in the Purchase Agreement and that Rexing's refusal to take more loads was excused through the Purchase Agreement's force majeure clause.

---

[14] R.72-24 at 2.

Having failed to receive assurances from Rexing, Rembrandt attempted to resell the eggs. Rembrandt elected not to resell Rexing's eggs on the national egg exchange because it was concerned that the market would be flooded and that prices would drop. Rembrandt informed the exchange, however, that it had supply available for interested buyers and eventually resold 133 of the remaining 198 loads through private sales. Eighty-two of those loads were sourced from Tipton farms, which resulted in the lowest freight cost for the buyers.[15] Rembrandt used the unsold, remaining sixty-five loads to satisfy its existing commitments to its liquid and powdered egg customers. For these sixty-five loads, Rembrandt invoiced Rexing for the difference between the contract price under the Purchase Agreement and "the actual market prices at which Rembrandt was able to sell loads to third parties at the same time."[16] Rexing refused to pay the invoiced amounts.

## B.

### 1. Rembrandt's summary judgment motion

Rexing filed this action in Superior Court in Vanderburgh County, Indiana, asking that the court declare that it was excused from purchasing eggs from Rembrandt under the Purchase Agreement's force majeure clause and that its repudiation was justified because Rembrandt had violated

---

[15] Following Rexing's repudiation, Tipton hens continued to be plagued with MG, and Rembrandt depopulated several barns at Tipton from July through September 2017.

[16] R.78 at 5.

express warranties. Rembrandt removed the action to the district court on diversity grounds. Once in the district court, Rembrandt answered the complaint and filed a counter-claim, alleging both a count for breach of contract and a count for breach of a credit agreement and requesting dam-ages, attorneys' fees, and interest.[17]

Following discovery, Rembrandt moved for summary judgment on all counts of Rexing's complaint, as well as on its counterclaim for breach of contract. The district court granted Rembrandt's motion with respect to liability but de-nied Rembrandt summary judgment as to the amount of damages.

The court first determined that Rembrandt had not breached any express warranty that the eggs would be sourced from the Tipton farms; consequently, its sourcing the eggs from alternative locations was not a valid basis for Rexing's repudiation. Moreover, the court explained,

> even assuming it were a breach for Rembrandt to source eggs from outside of Tipton after the Ramp Up Period, Rexing would not have been excused from continued performance under the purchase agreement. Iowa's UCC permits a buyer to cancel a contract "[w]henever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract." Iowa Code § 554.2612(3). Rexing, however, [had] ma[de]

---

[17] Rembrandt abandoned its cause of action for breach of the credit agreement prior to trial. *See* R.184 at 1–2.

> no showing or argument that having to spend
> more on delivery or packaging from certain lo-
> cations would impair in any way the value of
> the whole contract. At most, it may [have
> made] performance more expensive for Rex-
> ing, but cancellation [was] not permitted for
> this reason.[18]

The court also concluded that Rexing could not have "re-
scinded the contract based upon a breach of the location
term. Rescission," the court explained, "is appropriate only
where '(1) the injured party [is not] in default, (2) the breach
[is] substantial and go [sic] to the heart of the contract, and
(3) remedies at law [are] inadequate.'"[19] However, Rexing
had not demonstrated a genuine issue of fact regarding these
requirements because (1) "Rexing had underpaid for certain
deliveries of eggs and was therefore in default," (2) "any al-
leged breach did not reach the heart of the contract," and (3)
"any breach could … be remedied by damages for the in-
creased expense."[20] "In sum," the court concluded, "any
breach of the location term would not have excused Rexing's
continued performance under the purchase agreement."[21]
Moreover, the court observed that the only damages that
Rexing would have incurred were for "shipping and packag-

---

[18] R.110 at 22–23 (first alteration in original).

[19] *Id.* at 23 (first, second, and fourth alterations in original) (quoting
*Clark v. McDaniel*, 546 N.W.2d 590, 595 (Iowa 1996)).

[20] *Id.*

[21] *Id.*

ing."[22] However, not only did Paragraph M of the Purchase Agreement limit incidental and consequential damages, the Purchase Agreement provided that Rexing would receive a $0.05 discount per dozen for eggs sourced from outside of Tipton, and Rexing had received this discount.[23]

After concluding that "Rembrandt [wa]s … entitled both to summary judgment on Rexing's claim for a declaratory judgment that its performance was excused and to partial summary judgment on its own claim as to Rexing's breach of the purchase agreement by refusing to accept loads it was obligated to purchase,"[24] the court addressed Rembrandt's claims for damages. The court set forth the applicable damage provisions of Iowa's version of the UCC, specifically Iowa Code §§ 554.2703, 554.2706, and 554.2708. Turning to the parties' arguments, the court concluded that it could "be brief … because Rembrandt f[ell] short of establishing the amount of its damages as a matter of law."[25] Specifically, it noted that, with respect to the damages related to resale, summary judgment was inappropriate because what consti-

---

[22] *Id.* (internal quotation marks omitted).

[23] The district court also rejected Rexing's claim that its performance was excused based on the force majeure clause and commercial impracticability. *See id.* at 30–35. Rexing does not challenge those rulings on appeal.

[24] *Id.* at 35.

[25] *Id.* at 39.

tutes a commercially reasonable resale is a question of fact reserved for the jury.[26] It did note, however, that

> summary judgment [wa]s not defeated merely because Rembrandt elected to source some loads from outside of Tipton. … [F]or purposes of Rembrandt's resale remedy, the case law establishes that fungible goods such as cage-free white eggs may be substituted as long as they are reasonably identified to the contract. Reasonable identification to the contract looks to the type and quality of the goods, and Rexing ma[de] no argument that the eggs sourced from outside Tipton were any different from the Tipton eggs. Therefore, Rembrandt was not precluded from substituting loads from other sources to calculate its damages pursuant to that remedy election, though whether the sales were commercially reasonable; whether Rembrandt's damages calculations properly accounted for "expenses saved in consequence of the buyer's breach," and whether Rexing was properly credited to the extent the resold loads fell beneath the threshold quality level remain[ed] at issue for trial.[27]

The parties therefore proceeded to trial on Rembrandt's claim for damages.

---

[26] *Id.*

[27] *Id.* at 41 (citation omitted).

**2. Pretrial and trial proceedings**

Prior to trial, Rembrandt moved in limine to prevent the jury from hearing testimony from Rexing's expert, Dr. James Woods, that Rembrandt's damage estimate was overstated because it included sales of non-Tipton eggs. Rembrandt argued that not only did Dr. Woods's proposed testimony constitute an "improper legal conclusion," but "the Court ha[d] already rejected this argument in its summary judgment Order":

> The Court held that because the Rexings did not dispute that all cage-free white eggs are fungible, and Rembrandt was permitted to substitute cage-free eggs from any location upon the Rexings' repudiation. Additionally, prior to repudiation, the Rexings requested eggs from other [sic] on numerous occasions and knowingly accepted each delivery of non-Tipton eggs.[28]

The district court denied the motion in limine as it related to general information about "site-sourcing," noting that the evidence was relevant to the commercial reasonableness of Rembrandt's actions;[29] however, it did grant the motion in limine with respect to Dr. Woods's testimony because it believed that his testimony included legal conclusions. It explained that

---

[28] R.144 at 3 (citation omitted).

[29] R.180 at 38.

> [i]n multiple places in his report, Dr. Woods asserts what he believes to be the proper measure or formula for Rembrandt's damages. Aside from the fact that the above assertions delve into matters of law, [his] formulas are different, or could be construed to be different, from the Court's jury instructions. Iowa law sets forth the measure of damages.[30]

A two-day trial was held in November 2019. At the close of Rembrandt's case, Rexing moved for a directed verdict under Federal Rule of Civil Procedure 50(a). Rexing maintained that Rembrandt had failed to present any "credible" or "documented evidence" that the average case weights for the loads of eggs that Rembrandt resold were between forty-seven and fifty-two pounds,[31] as required by Exhibit A to the Purchase Agreement. Rexing noted that the jury would be instructed that "the eggs sold ha[d] to conform to the parties' contract."[32] Rexing submitted that, because there was no evidence that the eggs conformed to the terms of the Purchase Agreement, Rembrandt was "not entitled to damages."[33] The district court denied Rexing's motion. Prior to jury instructions and closing arguments, Rexing renewed its Rule

---

[30] R.197 at 2 n.1 (citations omitted).

[31] Trial Tr. II at 370.

[32] *Id.* at 371.

[33] *Id.*

50 motion without elaboration. The court again denied the motion.[34]

The court then instructed the jury on the damages it could award for losses resulting from Rembrandt's resale of Rexing's eggs to other buyers. Specifically, the court instructed the jury that, in order to recover under the resale damages method, Rembrandt had to prove by a preponderance of the evidence: "One, the resales were made in good faith and in a commercially reasonable manner; Two, the eggs sold conformed to the parties' contract; Three, Rembrandt provided Rexing Eggs reasonable notice under the circumstances of Rembrandt's intent to resell the eggs."[35] The jury also was instructed on the meaning of commercial reasonableness: "[A] resale is commercially reasonable if it was fair, done in good faith, and corresponds to commonly accepted commercial practice."[36] Additionally, "[e]ach aspect of the resales must be commercially reasonable, including the method, manner, time, place, and terms."[37] Finally, the court explained that, "[i]n making the resales, Rembrandt was permitted to depart from the terms and conditions of the original contract to the extent such departure was 'commercially reasonable' in the circumstances."[38]

---

[34] *See id.* at 385.

[35] *Id.* at 394.

[36] *Id.*

[37] *Id.* at 394–95.

[38] *Id.* at 395.

Regarding Rembrandt's losses resulting from eggs that it was unable to resell, the court instructed the jury that it could award Rembrandt damages established under "the market price damages method."[39] According to this method, "Rembrandt's damages [we]re the difference between the contract price and the market price at the time the eggs were to be delivered to Rexing Eggs."[40] "The term 'market price,'" the court continued, "means the cash sales price between a voluntary, willing seller who is not forced to sell, and a voluntary, willing buyer who is not forced to buy. It assumes a buyer and seller are bargaining freely in the open market."[41]

The jury returned a verdict in favor of Rembrandt for resale damages in the amount of $1,268,481 and market damages in the amount of $193,752.[42] Following the verdict, Rexing did not make a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), nor did it move for a new trial under Federal Rule of Civil Procedure 59.

### 3. Posttrial Proceedings

After Rembrandt prevailed at trial, it moved for attorneys' fees, prejudgment interest, and costs. Specifically, Rembrandt sought $420,798.39 in prejudgment interest under Paragraph E of the Purchase Agreement which required payment within twenty-one days of the invoice date, and

---

[39] *Id.*

[40] *Id.* at 395–96.

[41] *Id.* at 396.

[42] *See* R.207.

made "[p]ast due invoices … subject to an interest charge of one percent (1%) per month."[43]

Following briefing on the motion, the district court asked for supplemental briefing on the application of Iowa's usury law to the Purchase Agreement.[44] The parties filed their submissions, and, with the benefit of their views, the district court determined that Paragraph E violated Iowa's usury law. It began its analysis by observing that Iowa Code § 668.13 provides that, "[i]f the interest rate is fixed by a contract on which [a] judgment or decree is rendered, the interest allowed shall be at the rate expressed in the contract, not exceeding the maximum rate permitted under 535.2."[45] Applying the methodology set forth in § 535.2(3), the court concluded that the applicable default rate was 3.5%.

The court then addressed whether the Purchase Agreement fell within the exceptions set forth in Iowa Code § 535.2. Among these is the "Business Credit Exception" that covers "[a] person borrowing money or obtaining credit for business or agricultural purposes."[46] The court further explained that, assuming the Purchase Agreement did not fall within a statutory exception, Iowa law penalizes those who seek to enforce a usurious interest rate:

---

[43] R.217 at 12 (first alteration in original) (quoting Purchase Agmt. at 2).

[44] *See* R.243 at 2.

[45] R.251 at 4 (alterations in original) (quoting Iowa Code § 668.13).

[46] *Id.* at 6 (alteration in original) (quoting Iowa Code § 535.2(2)(a)(5)).

> If it is ascertained in an action brought on a contract that a rate of interest has been contracted for, directly or indirectly, in money or in property, greater than is authorized by this chapter, the rate shall work a forfeiture of eight cents on the hundred by the year upon the amount of the principal remaining unpaid upon the contract at the time judgment is rendered, and the court shall enter final judgment in favor of the plaintiff and against the defendant for the principal sum remaining unpaid without costs, and also against the defendant and in favor of the state, to be paid to the treasurer of state for deposit in the general fund of the state, for the amount of the forfeiture. If unlawful interest is contracted for the plaintiff shall not have judgment for more than the principal sum, whether the unlawful interest is incorporated with the principal or not.[47]

Turning to the application of these provisions to the Purchase Agreement, the district court evaluated the case law cited by Rembrandt, but determined that the Purchase Agreement was unlike the arrangements in those authorities. The Purchase Agreement "did not call for a sale of goods on credit, rather it established a delayed payment mechanism due to the unique nature of the parties' agreement," specifically the right of Rexing to inspect the eggs and remit pay-

---

[47] *Id.* at 5 (quoting Iowa Code § 535.5).

ment adjusted to the quality level of the load.[48] Thus, the district court not only denied Rembrandt contractual interest, it also imposed the penalty for seeking usurious interest rates under Iowa Code § 535.5 and denied Rembrandt statutory interest, attorneys' fees, and costs.

Rexing appealed the judgment in favor of Rembrandt, and Rembrandt cross-appealed the denial of attorneys' fees and interest.

## II

### REXING'S APPEAL

Rexing takes exception to the district court's decision with respect to damages on three grounds. First, it maintains that the district court misunderstood the nature of the resale remedy when a contract involves the sale of future, fungible goods. Second, it maintains that the jury's award of damages on the resale remedy cannot stand because the eggs sold after Rexing's repudiation did not conform to the Purchase Agreement. Third, turning to the jury's verdict on the eggs that Rexing could not resell, it submits that the jury did not have sufficient evidence of market transactions on which to base its award. We address each of these contentions in turn.

### A.

Rexing maintains that the district court erred in its application of the resale remedy under Iowa's version of the

---

[48] *Id.* at 14.

UCC.[49] In its view, this error results from two aspects of the court's reasoning: (1) that Rembrandt "could substitute the goods 'identified to the contract' for other goods under the resale remedy under U.C.C. § 2-706 as long as the substituted goods were 'reasonably identified' to the contract";[50] and (2) that a seller may "evidence its damages by way of a 'substitute transaction' as long as the substituted goods are 'fungible.'"[51] The combined effect of these conclusions, Rexing submits, is problematic because

> substitution effectively allows the seller to inflate its damages in situations where the originally identified goods are never finished. By substitution, Rembrandt minimized its actual damages (by reducing the Tipton Facilities' supply), substituted eggs from its existing surplus supply, and after sufficient sales to third-party buyers claimed these sales as substitute transactions under § 2-706. ... Such a ruling does not put a seller in "as good a posi-

---

[49] The Purchase Agreement provides for application of Iowa law. *See* Purchase Agmt. at 3.

[50] Appellants' Br. 9.

[51] *Id.* (referencing *Servbest Foods, Inc. v. Emessee Indus., Inc.*, 403 N.E.2d 1 (Ill. Ct. App. 1980)). The parties refer to this as the *Servbest* rule. We discuss *Servbest* and the cases that followed in its wake *infra* note 54 and accompanying text.

tion" as if buyer had not breached but in a better position.[52]

---

[52] Appellants' Br. 9–10. Although it is clear what Rexing's argument is, there is a dispute among the parties as to which of the district court's rulings is the basis for Rexing's appeal. Rexing maintains that "[t]he substitution issue implicates the district court's Summary Judgment Order as well as a series of pretrial orders … ." *Id.* at 10 (citations omitted). As a result, it contends that we should apply a de novo standard of review to the district court's analysis. *See id.* at 11. Rembrandt, however, maintains that the district court's summary judgment ruling was limited to liability; according to Rembrandt, "the district court fastidiously avoided ruling" on any issue related to damages. Appellee/Cross-Appellant's Combined Resp. and Opening Br. 13. Instead, Rembrandt submits, Rexing is complaining about the commercial reasonableness of its actions following Rexing's breach. This was an issue submitted to, and resolved by, the jury. Rembrandt maintains that the language in the summary judgment order on which Rexing relies is mere dicta and without legal effect.

Although the district court did not issue any definitive rulings on damages in its summary judgment order, its articulation of the damages standard in that order laid the foundation for later actions, namely its ruling on the motions in limine and jury instructions. We review underlying legal issues with respect to motions in limine and jury instructions de novo. *See United States v. Wade*, 962 F.3d 1004, 1011 (7th Cir. 2020) ("We … review *de novo* the district court's legal conclusions underlying the grant of the motion, though we still review its ultimate decision to grant the motion for abuse of discretion."); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 835 (7th Cir. 2016) ("We review a district court's choice of jury instruction de novo when the underlying assignment of error implicates a question of law … .").

According to Rexing, the district court's legal error also infected the district court's liability determination because this is a case in which "the issues of causation and damages are 'inextricably linked.'" Appellants' Combined Reply and Resp. Br. 3 (quoting *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006)). Because we find no error in the dis-

(continued … )

We begin our analysis with the applicable provisions of Iowa's UCC, Iowa Code § 554.2703;[53] it provides:

> Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 554.2612), then also with respect to the whole undelivered balance, the aggrieved seller may:
>
> 1. withhold delivery of such goods;
> 2. stop delivery by any bailee as hereafter provided (section 554.2705);
> 3. proceed under section 554.2704 respecting goods still unidentified to the contract;
> 4. resell and recover damages as hereafter provided (section 554.2706);

---

( … continued)

trict court's recitation and application of the law, we have no occasion to consider this argument. Nevertheless, we do note that Rexing's contentions regarding the effects of the district court's summary judgment ruling were not fully developed until its reply brief, and we caution counsel that such an approach risks waiver. *See, e.g.*, *Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 507 n.30 (7th Cir. 2020) ("[A]rguments raised for the first time in a reply brief are waived.").

[53] Both parties agree that Iowa Code § 554.2703 provides the basis for Rembrandt's damages. *See* Appellants' Br. 11.

5. recover damages for nonacceptance (section 554.2708) or in a proper case the price (section 554.2709);

6. cancel.

Rembrandt availed itself of the resale remedy under Iowa Code § 554.2706(1), which provides:

> Under the conditions stated in section 554.2703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (section 554.2710), but less expenses saved in consequence of the buyer's breach.

Subsection (2) further requires that "[t]he resale must be reasonably identified as referring to the broken contract"; however, "it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach." *Id.* § 554.2706(2); *see also* Matt Crockett, *The Law of Sales Under the Uniform Commercial Code* § 8.2 (2020 update) ("The Code makes it clear that the goods need not be in existence at the time of resale, and if they are in existence they need not have been identified to the original sales contract."). The key is that "every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable." Iowa Code § 554.2706(2).

The official commentary to the UCC provides guidance on how UCC § 2-706 applies in situations where, as here, there has been an "anticipatory repudiation of a contract for future goods." UCC § 2-706 cmt. 7 (Am. L. Inst. & Unif. L. Comm'n 1977). It states:

> The provision of subsection (2) that the goods need not be in existence to be resold applies when the buyer is guilty of anticipatory repudiation of a contract for future goods, before the goods or some of them have come into existence. In such a case the seller may exercise the right of resale and fix his damages by "one or more contracts to sell" the quantity of conforming future goods affected by the repudiation. The companion provision of subsection (2) that resale may be made although the goods were not identified to the contract prior to the buyer's breach, likewise contemplates an anticipatory repudiation by the buyer but occurring after the goods are in existence. If the goods so identified conform to the contract, their resale will fix the seller's damages quite as satisfactorily as if they had been identified before the breach.

*Id.* Thus, as long as the eggs that Rembrandt used for resale "conform" to the Purchase Agreement, it is not necessary that the eggs resold by Rembrandt and used as the basis of its § 554.2706 remedy be the exact eggs that it would have sold to Rexing had Rexing not repudiated the contract.

Moreover, courts have recognized that, when the resale involves fungible goods, there is "no reason why … a seller

could not recover a deficiency award under section 2-706 based upon a resale of goods other than those identified to the contract inasmuch as such a sale would not affect or alter the price received for the goods in either a private or public sale." *Servbest Foods, Inc. v. Emessee Indus., Inc.*, 403 N.E.2d 1, 9 (Ill. App. Ct. 1980); *Firwood Mfg. Co. v. Gen. Tire, Inc.*, 96 F.3d 163, 168 (6th Cir. 1996) ("[W]e find persuasive the reasoning of those courts that allow sellers to substitute fungible goods for purposes of resale so long as the goods truly are fungible and the resale itself is commercially reasonable."); *Apex Oil Co. v. Belcher Co. of New York,* 855 F.2d 997, 1005 (2d Cir. 1988) ("[A]t least where fungible goods are concerned, identification is not always an irrevocable act and does not foreclose the possibility of substitution.").[54] Here,

---

[54] Rexing argues that *Apex Oil Co. v. Belcher Co. of New York*, 855 F.2d 997 (2d Cir. 1988), found fault with the analysis in *Servbest Foods, Inc. v. Emessee Indus., Inc.*, 403 N.E.2d 1 (Ill. App. Ct. 1980). *See* Appellants' Br. 15–16. Although *Apex Oil* did disagree with part of the court's rationale in *Servbest*, *Apex Oil* supports application of the resale remedy here. Specifically, the court in *Apex Oil* explained that "the provision regarding nonexistent and nonidentified goods deals with the special circumstances involving anticipatory repudiation by the buyer. Under such circumstances, there can of course be no resale remedy unless the seller is allowed to identify goods to the contract after the breach." 855 F.2d at 1003–04 (citation omitted). Thus, *Apex Oil* explicitly noted that the resale remedy was available in circumstances where, as here, Rexing repudiated the contract before the goods that would satisfy the later loads had come into existence.

In its brief, Rexing relies most heavily on *Nobs Chemical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 214 (5th Cir. 1980), which involves a different provision of the UCC, § 2-708, applicable to "jobber[s]"—sellers who never acquire the contract goods and therefore cannot avail themselves of the resale remedy. *Id.* at 215. Here, it is undisputed that Rembrandt

(continued … )

Rexing acknowledged both in its brief[55] and at oral argument that the shell eggs supplied by Rembrandt to Rexing were fungible, and, more specifically, that there was no difference between the Tipton and non-Tipton eggs. Consequently, Rexing's argument that Rembrandt is not entitled to the full measure of its resale damages because the eggs were not all sourced from Tipton finds no support in the UCC or in the interpreting case law.

Rexing maintains, however, that the rule set forth in *Servbest* is best understood as establishing "a means to quantify damages through a substitute transaction."[56] However, it continues, "there is no need to resort to a substitute transaction … to quantify damages where the originally identified goods never come … into existence."[57] According to Rexing, "Rembrandt never planned, expended money, or had a reasonable expectation that Rexing … would take any of its other supply at any time."[58] Because Rembrandt had no expectation that Rexing would accept any eggs from non-Tipton facilities, it could not use the sale of non-Tipton eggs as a basis for damages for lost sales under the contract.

---

( … continued)

owned and possessed the eggs that were the subject of the Purchase Agreement.

[55] *See* Appellants' Br. 15.

[56] *Id.* at 17.

[57] *Id.* at 18.

[58] *Id.* at 18–19.

Rexing is incorrect as a matter of law and of fact. Iowa Code § 554.2706(2) explicitly makes the resale remedy available to sellers even when the goods have not come into existence: "[I]t is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach." We are bound by this unambiguous statutory language. *See State v. Richardson*, 890 N.W.2d 609, 616 (Iowa 2017) (explaining that if statutory language "is unambiguous, [the] inquiry stops there").

Moreover, there was evidence in the record that Rexing would, and did, accept non-Tipton eggs. Prior to Rexing's repudiation, approximately ten percent of the eggs delivered to Rexing were sourced from locations other than Tipton.[59] And, although Rexing lodged many complaints with Rembrandt regarding the quality of the eggs, it has not directed us to any part of the record reflecting complaints about the origin of the eggs.[60]

At bottom, Rexing is attempting to create an exception to the UCC's resale remedy that is not tethered to the statutory language, the official comments, or the case law. Contrary to Rexing's assertions, the resale remedy is available for con-

---

[59] *See* Appellants' Br. 19 n.5; Trial Tr. I at 156–57.

[60] In its summary judgment order, the district court determined that Rexing could not establish that Rembrandt had breached the Purchase Agreement by sourcing eggs from places other than Tipton farms because Rexing received the agreed-upon discounts for non-Tipton eggs and because the contract explicitly precluded incidental and consequential damages. *See* R.110 at 29. Rexing does not challenge that aspect of the court's summary judgment order.

tracts involving future sales of fungible products, and the seller may recover its damages as long as "every aspect of the sale including the method, manner, time, place and terms [is] commercially reasonable." Iowa Code § 554.2706(2). The question whether Rembrandt acted in a commercially reasonable manner following Rexing's repudiation was submitted to the jury. The jury found in favor of Rembrandt, and Rexing has not challenged the jury's finding on appeal.[61]

**B.**

As we noted earlier, Rexing also challenges two aspects of the jury's verdict. First, it maintains that there was no evidence that the eggs sold by Rembrandt met the case-weight requirement of the Purchase Agreement. Because the resold eggs did not conform to the Purchase Agreement, Rexing maintains that those eggs could not form the basis of a resale remedy, and Rembrandt should not have received any damages under § 554.2706. Second, Rexing submits that there was no evidence of actual market transactions to support the calculation of damages with respect to the eggs that Rembrandt used for its own purposes. Consequently, according to Rexing, the jury lacked critical evidence to calculate Rembrandt's damages based on market price.

Rembrandt counters that Rexing has waived any challenge to the jury's verdict by failing to bring a timely motion

---

[61] In its reply, Rexing steadfastly maintains that it is not challenging this aspect of the jury's damages award, but the district court's legal ruling on damages set forth in its summary judgment order.

under Federal Rule of Civil Procedure 50(b). Rembrandt is correct.

> A party must move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) and renew the motion under Rule 50(b) after the jury's verdict if the party wishes to preserve a sufficiency of the evidence challenge to a civil verdict. … Failure to file a post-verdict motion constitutes a waiver of sufficiency of the evidence challenges.

*Stegall v. Saul*, 943 F.3d 1124, 1127 (7th Cir. 2019); *see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 407 (2006) ("[W]e hold that since respondent failed to renew its preverdict motion as specified in Rule 50(b), there was no basis for review of respondent's sufficiency of the evidence challenge in the Court of Appeals.").

Here, Rexing made a Rule 50(a) motion challenging the sufficiency of the evidence on the ground that there was "no credible evidence" that the eggs resold by Rembrandt met the case-weight requirement set forth in the Purchase Agreement.[62] However, it did not file a postverdict motion challenging the jury's verdict on this or any other basis. Its failure to do so is fatal to its argument concerning the case-weight challenge.[63]

---

[62] Trial Tr. II at 370–71.

[63] In its reply, Rexing does not assert that it complied with *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), by making a postverdict motion under Rule 50(b). Nor does it attempt to bring its sit-

(continued … )

Rexing's challenge to the jury's damages award for the eggs that Rembrandt could not resell is foreclosed for the same reason. Rexing failed to file a postverdict motion challenging this—or any—aspect of the jury's damage award.

---

( … continued)

uation within a recognized exception to *Unitherm*'s holding. *See, e.g., Holder v. Ill. Dep't of Corr.*, 751 F.3d 486, 491–92 (7th Cir. 2014) (holding that it would be nonsensical to require a plaintiff to make a Rule 50(b) motion when (1) the plaintiff had made a timely motion under Rule 50(a), (2) the court had taken the motion under advisement, and (3) following the jury's verdict, the court had granted the plaintiff's Rule 50(a) motion). Instead, Rexing explains that it

> did not move for a new trial and do[es] not believe a new trial is warranted even if the Court finds Rembrandt's substitutions erroneously inflated its damages. … Either this Court or the district court can easily distinguish the Tipton and non-Tipton egg loads from Rembrandt's damages. Therefore, while the availability of these damages as a matter of law is being questioned, the factual basis in the record is clear.

Appellants' Combined Reply and Resp. Br. 11 (citation omitted). However, a new trial is not the only remedy available under Rule 50(b); the district court also may "direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b)(3). Here, Rexing asks us to direct a verdict in its favor on both the resale and market damages. This is a matter that should have been presented to the district court in the first instance. *See Unitherm*, 546 U.S. at 401–02 (explaining the "benefits of the district court's input at [the postverdict] stage" and observing that the import of those observations "apply with equal force whether a party is seeking judgment as a matter of law or simply a new trial").

At oral argument, counsel for Rexing noted that Rexing had filed a renewed Rule 50(a) motion at the close of evidence, which it believed was sufficient; however, *Unitherm* clearly holds otherwise.

Consequently, it has waived any challenge to the sufficiency of the evidence supporting the jury's verdict.[64]

## III

## REMBRANDT'S CROSS APPEAL

In its cross appeal, Rembrandt asks that we review the district court's determination that the interest term in the Purchase Agreement is usurious under Iowa law. Rembrandt maintains that the district court's conclusion is erroneous because the Purchase Agreement falls squarely within the "Business Credit Exception" to Iowa's usury law.[65] We agree.

---

[64] Not only did Rexing fail to raise this ground in a Rule 50(b) motion, it also failed to articulate this challenge in a Rule 50(a) motion. The language of the rule makes clear that the party challenging the sufficiency of the evidence under Rule 50(a) must specify the law and the facts on which its motion rests. *See* Fed. R. Civ. P. 50(a)(2) ("The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment."). At trial, Rexing only complained about the sufficiency of the evidence regarding case weight; it made no challenge to the market price calculation. Nevertheless, Rembrandt has not presented this argument, and, therefore, we rest our determination solely on Rexing's failure to file a postverdict motion.

[65] Rembrandt maintains that its cross-appeal involves the interpretation of Iowa's usury statute and the Purchase Agreement, both of which are reviewed de novo. *See* Cross-Appellant's Reply Br. 2–3. Rexing contends that the abuse of discretion standard applies to a district court's decision to award or deny prejudgment interest. *See* Appellants' Combined Reply and Resp. Br. 19–20. However, "[i]f the district court reached its conclusion because of its interpretation of relevant law, … then we review that question of law *de novo* because a district court's application of an erroneous view of the law is by definition an abuse of discretion." *Sosebee v.*

(continued … )

**A**.

Iowa Code § 535.4 sets forth the general prohibition against usury: "No person shall, directly or indirectly, receive in money or in any other thing, or in any manner, any greater sum or value for the loan of money, or upon contract founded upon any sale or loan of real or personal property, than is in this chapter prescribed." The Supreme Court of Iowa has identified "four essential elements" of usury: "(1) a loan or forbearance, either express or implied, of money or of something circulating as such; (2) an understanding between the parties that the principal shall be repayable absolutely; (3) the exaction of a greater profit than is allowed by law; and (4) an intention to violate the law." *State ex rel. Turner v. Younker Bros. Inc.*, 210 N.W.2d 550, 555 (Iowa 1973). Moreover, as the Supreme Court of Iowa has observed, "[t]his statute does not differentiate between the seller of property and the lender of money … ." *Id.* at 559. Thus, the section "expressly includes contracts founded upon *any* sale or loan of real or personal property." *Id.* Here, all parties agree that the Purchase Agreement generally falls within the scope of the usury statute because it was "based on a contract founded upon the sale of personal property," it involved a "forbearance," and it contained an interest provision that exceeded the presumptive rate of interest allowed by Iowa law.[66]

---

( … continued)

*Astrue*, 494 F.3d 583, 586 (7th Cir. 2007). We therefore review this legal issue de novo.

[66] *See* Appellants' Combined Reply and Resp. Br. 39–40.

The presumptive statutory ceiling for interest rates, however, does not apply to *all* sales or loans of real or personal property. Iowa Code § 535.2(2)(a) provides that certain "persons may agree in writing to pay *any* rate of interest." Among those listed are "person[s] borrowing money or obtaining credit for business or agricultural purposes," commonly known as the Business Credit Exception. Iowa Code § 535.2(2)(a)(5).[67] The district court determined, and the par-

---

[67] Iowa Code § 535.2(2)(a) provides:

> The following persons may agree in writing to pay any rate of interest, and a person so agreeing in writing shall not plead or interpose the claim or defense of usury in any action or proceeding, and the person agreeing to receive the interest is not subject to any penalty or forfeiture for agreeing to receive or for receiving the interest:

> (1) A person borrowing money for the purpose of acquiring real property or refinancing a contract for deed.
> (2) A person borrowing money or obtaining credit in an amount which exceeds the threshold amount as defined in section 537.1301, exclusive of interest, for the purpose of constructing improvements on real property, whether or not the real property is owned by the person.
> (3) A vendee under a contract for deed to real property.
> (4) A domestic or foreign corporation, and a real estate investment trust as defined in section 856 of the Internal Revenue Code, and a person purchasing securities as defined in chapter 502 on credit from a broker or dealer registered or licensed under chapter 502 or under the federal Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., as amended.
> (5) A person borrowing money or obtaining credit for business or agricultural purposes, or a person borrowing money or obtaining credit in an amount which exceeds

(continued … )

ties agree, that the Purchase Agreement is for a business purpose. The only question, therefore, is whether the contract involves "borrowing money or obtaining credit." To answer this question, Rembrandt invites our attention to *State ex rel. Turner v. Younker Brothers Inc.*, 210 N.W.2d at 550.

In *Turner*, the Supreme Court of Iowa considered whether a retail installment contract exacted interest in excess of that allowed by Iowa Code § 535.2. The first step in the court's analysis was to determine whether the installment contract was subject to the usury statute. As the court explained, "the first enumerated essential element" of the usury statute is that there must be "[a] loan or forbearance." *Id.* at 561. In the case of the "revolving charge account" before it, "the purchaser agree[d] 'to pay in full within 30 days after the billing date on my/our account for all purchases made during the preceding billing cycle without a finance charge.' The agreement then provide[d] for additional charges for payments made after 30 days." *Id.* at 562. The court then explained how this arrangement fell within the Iowa usury statute:

> When time is given to pay the [cash price] and an amount is assumed to be paid which is greater than the cash price with legal interest,

---

( … continued)

the threshold amount, as defined in section 537.1301, for personal, family, or household purposes. As used in this paragraph, "agricultural purpose" means as defined in section 535.13, and "business purpose" includes but is not limited to a commercial, service, or industrial enterprise carried on for profit and an investment activity.

the result is an agreement for forbearance from demanding payment of an existing debt.

Forbearance does not necessarily require an actual loan of money. It generally signifies the giving of time for the payment of a debt. In any transaction in which there is a delay until final payment there is forbearance as that term is used in the requirement for a finding of usury.

We conclude that forbearance as used in usury law is present in both credit plans offered by Younkers.

*Id*. (citations omitted).

In this case, Paragraph E of the Purchase Agreement allowed Rexing twenty-one days from the date of invoice to pay for eggs that had been shipped. After that time, Rexing would be charged interest at the rate of one percent per month. Because the Purchase Agreement provides for an additional charge of one percent in the event that Rembrandt endures a forbearance of payment after the expiration of the twenty-one-day payment period, this constitutes an extension of credit for purposes of the usury statute.

The district court concluded, however, that Paragraph E did not amount to a forbearance. According to the district court, the Purchase Agreement provided for delayed payment "because the Agreement specifically required that the eggs be graded, and the price adjusted accordingly. The nature of the transactions required time between shipment and payment so that the appropriate price could be determined.

This is fundamentally different from purchasing goods on credit … ."[68]

Even accepting the district court's characterization of the first twenty-one days,[69] the court's reasoning does not extend to Rexing's agreement under Paragraph E to pay "[p]ast due invoices" at "an interest charge of one percent (1%) per month."[70] With respect to this term, Rembrandt is forbearing payment in full in exchange for the payment of interest.

### B.

Nevertheless, Rexing maintains that the district court's conclusion that the Purchase Agreement does not fall within the Business Credit Exception should be affirmed for two primary reasons. First, it contends that "Rembrandt's *judgment* does not arise from a loan or credit provided to [Rexing] but from a failure to purchase contracted-for goods under Art. 2 of the U.C.C."[71] Second, it maintains that the Purchase Agreement itself did not involve the extension of cred-

---

[68] R.251 at 13.

[69] Because we conclude that the remainder of Paragraph E involves an extension of credit that places the Purchase Agreement within the Business Credit Exception, we need not, and do not, consider whether this initial twenty-one days constitutes a forbearance of payment such that this provision, standing alone, would constitute an extension of credit for purposes of the Business Credit Exception.

[70] Purchase Agmt. at 2.

[71] Appellants' Combined Reply and Resp. Br. 29 (emphasis added).

it necessary for application of the Business Credit Exception. We address each of these in turn.

**1**.

Rexing's first contention—that Rembrandt's judgment does not arise from a loan or credit—is foreclosed by the Supreme Court of Iowa's decision in *Kaiser Agricultural Chemicals, Inc. v. Peters*, 417 N.W.2d 437, 441 (Iowa 1987). In *Kaiser*, Peters bought several items from Kaiser, and, according to the terms of sale, finance charges were to be "assessed at 18% per year and compounded monthly." *Id.* at 438. Kaiser eventually brought suit seeking the account balance of $27,307.87, which "included $3,569.28 in finance charges." *Id.* After trial, judgment was entered on the principal amount, with the court awarding statutory, not contractual, interest. On appeal, Peters argued that the agreed-to rate of interest was usurious and, therefore, the penalty provision set forth in Iowa Code § 535.5 precluded any recovery of interest.[72] Kaiser, however, maintained that it had not violated the usury statute because Peters "ha[d] not paid any interest." *Id.* at 441. The Supreme Court of Iowa explained that the elements of usury

> must exist at the inception of the contract, since a contract which in its inception is unaffected by usury cannot be invalidated by a subsequent usurious transaction, nor, as a general rule, may a transaction that is usurious in its inception be subsequently cured. It is the

---

[72] *See supra* text accompanying note 47.

> agreement to exact and pay usurious interest, and not the performance of the agreement, which renders it usurious. The test to be applied in any given case is whether the contract, if performed according to its terms, will result in producing to the lender a rate of interest greater than is allowed by law, and whether such result is intended.

*Id.* (quoting 45 Am. Jur. 2d *Interest and Usury* § 111 (1969)). Thus, whether Peters had paid, and Kaiser had received, interest at the usurious rate was irrelevant because whether an agreement is usurious is based solely on the terms of the parties' agreement.

Whether the interest term in the Purchase Agreement is usurious, therefore, rises and falls on the language of the Purchase Agreement. If the Purchase Agreement is usurious, Rembrandt's later judgment for breach of the agreement cannot render it nonusurious. Similarly, if the Purchase Agreement itself is nonusurious, Rembrandt's later judgment for breach on the agreement cannot render it usurious.[73] Rexing's argument, therefore, that the nature of its judgment takes it outside of the Business Credit Exception cannot be reconciled with the Supreme Court of Iowa's interpretation of the usury statute in *Kaiser*.

---

[73] In its Combined Reply and Response Brief, Rexing does not address the Supreme Court of Iowa's holding in *Kaiser Agricultural Chemicals, Inc. v. Peters*, 417 N.W.2d 437, 441 (Iowa 1987), that post-contractual actions cannot be used to determine if an agreement is usurious. It similarly was silent on this point at oral argument.

**2.**

Rexing also argues that the Purchase Agreement did not involve an extension of credit necessary to come within the Business Credit Exception. Rexing maintains that, under the Supreme Court of Iowa's decision in *Turner*, it is possible to have an agreement that is a forbearance—and therefore is subject to the state's usury law—but does not constitute "borrowing money or obtaining credit" for purposes of the Business Credit Exception. *Turner*, however, does not support this proposition. As we already have explained, *Turner* involved consumer credit sales, and it was in this context that the Supreme Court of Iowa equated a forbearance of payment with an extension of credit.

Moreover, more recently, the Supreme Court of Iowa has held that a sales agreement with a provision very similar to that contained in Paragraph E of the Purchase Agreement could fall within the Business Credit Exception. *Power Equip., Inc. v. Tschiggfrie*, 460 N.W.2d 861 (Iowa 1990). According to the arrangement in *Tschiggfrie*,

> [i]tems purchased and equipment which had been serviced were picked up at plaintiff's place of business by defendant's employees. In so doing, these employees ordinarily, but not always, signed plaintiff's copy of an invoice form. On this form, it was stated that, in consideration for the granting of credit, defendant agreed to pay a specified finance charge in the event the prices stated in the invoice were not paid within thirty days.

*Id.* at 862. The Supreme Court of Iowa "agree[d] with plaintiff's contention that the law permits a section 535.2(2)(a)(5) agreement with respect to the type of transactions involved in the present dispute." *Id.* at 863. The court therefore remanded for a determination whether the employees' signatures on the invoices constituted a written agreement for purposes of the Business Credit Exception. *See id.*

Here, as noted, Paragraph E of the Purchase Agreement is strikingly similar to the terms of the invoices in *Tschiggfrie.* Specifically, both the invoices in *Tschiggfrie* and Paragraph E provide for the payment of interest in the event that there is a forbearance of payment of the invoiced amount beyond a specified time.

Because Paragraph E meets the requirements of the Business Credit Exception, we therefore reverse the district court's judgment denying Rembrandt contractual interest on the verdict. The district court's determination that the Purchase Agreement was usurious also formed the basis for its denial of attorneys' fees and costs. We therefore remand the case to the district court for both the calculation of contractual interest and further consideration of Rembrandt's motion for attorneys' fees.

## Conclusion

The district court employed the proper standard for resale damages under Iowa's version of the UCC in ruling on pretrial motions and instructing the jury. Additionally, Rexing failed to preserve any challenges to the jury's award of damages. We therefore affirm the district court's entry of judgment on the jury's award. However, because the Purchase Agreement fell within the Business Credit Exception to

Iowa's usury statute, the district court erred in denying Rembrandt contractual interest and failing to consider its request for attorneys' fees. We therefore reverse the judgment of the court on these issues and remand for further proceedings consistent with this opinion. Rembrandt may recover its costs in this court.

AFFIRMED in part; REVERSED and REMANDED in part